Argued September 5, decided September 26, 1911.

## STATE v. MEYERS.

### [117 Pac. 818.]

CRIMINAL LAW—TESTIMONY AT FORMER TRIAL.

1. Where a showing has been made that a witness resided in a foreign State, it will be presumed that his residence continued in the foreign State up to the time of trial; therefore his testimony given at a former trial is admissible.

CRIMINAL LAW—RIGHT TO CONFRONT WITNESSES—TESTIMONY AT FORMER TRIAL.

2. Article I, Section .11, of the Constitution of Oregon, guarantees to accused persons the right to confront witnesses, but, where the accused has had the right to cross-examine and confront a witness at an earlier trial, his constitutional right to meet him face to face is not violated by the admission of the evidence of such witness, when absent at a subsequent trial.

CRIMINAL LAW—EVIDENCE—MATERIALITY—FRAUD.

3. Evidence that accused attempted by flight and concealment to escape arrest is admissible; its weight being for the jury.

CRIMINAL LAW—TRIAL—INSTRUCTIONS—"FALSE."

4. The word "false," as used in Section 868, subd. 3, L. O. L., providing that a witness false in one part of his testimony is to be distrusted in another, is not the equivalent of "mistaken"; and hence an instruction in the language of the statute is not erroneous for refusal to add "willfully" before "false."

CRIMINAL LAW—TRIAL—INSTRUCTIONS—GOOD CHARACTER.

5. Where the jury were instructed that the testimony as to defendant's reputation as a law-abiding citizen was admitted to aid the presumption of innocence, and that if, after considering all the evidence, they believe beyond a reasonable doubt that defendant is guilty, they shall so declare, though he may have heretofore had ever so good a reputation, the instruction did not take from the jury the consideration of defendant's previous good character.

HOMICIDE—TRIAL—INSTRUCTIONS—STIPULATIONS.

6. Where it was stipulated that deceased was a police officer, an instruction that, if deceased was a policeman, he was therefore a peace officer, with authority to make arrests without a warrant for violations of the city ordinances or laws of the State, and if he, being a police officer, arrested defendant, it is presumed that his official duty as to such arrest was regularly performed, but that this may be rebutted, is correct.

STIPULATIONS—CONSTRUCTION.
7. Where it was stipulated that deceased was a police officer, and
that he had neither a warrant for the arrest of nor orders to arrest
defendant, and there was no direct evidence that defendant at the time
of the attempted arrest was violating any law or ordinance, the stipula-
tion does not extend to the conduct of defendant in the presence of
the officer, and the court would not be warranted in instructing the jury
that the arrest was unlawful.

From Marion: PERCY R. KELLY, Judge.

Statement by MR. JUSTICE BEAN.

The defendant, George Meyers, was indicted by the grand jury of Marion County for the crime of murder in the first degree. He was tried, convicted of murder in the second degree, and sentenced. Upon appeal to this court the judgment was reversed, and the case remanded for a new trial: *State* v. *Meyers,* 57 Or. 50 (110 Pac. 407). As the result of a second trial defendant was found guilty of the crime of manslaughter, and from a judgment sentencing him to the penitentiary for an indeterminate period he appeals, alleging errors, the first of which is that the court erred in permitting, over the objection of counsel for defense, the official reporter, reporting the testimony at the first trial, to read to the jury the notes of the testimony of Arthur Meyers, brother of defendant, given at the former trial. AFFIRMED.

For appellant there was a brief over the names of *Mr. Peter H. D'Arcy, Mr. Samuel T. Richardson* and *Mr. William M. Kaiser,* with oral arguments by *Mr. D'Arcy* and *Mr. Richardson.*

For the State there was a brief over the names of *Mr. John H. McNary* and *Mr. Walter C. Winslow,* with an oral argument by *Mr. Winslow.*

MR. JUSTICE BEAN delivered the opinion of the court.

Counsel for defendant contends that no foundation was laid for the introduction of the reporter's notes of Arthur Meyers' testimony. For the purpose of laying such a

foundation, the State produced as a witness Mr. H. P. Minto, sheriff of Marion County, whose testimony in regard thereto was substantially as follows: That he was acquainted with Arthur Meyers; that he had a subpoena for him, which was produced; that he endeavored without success to find him within the State and upon inquiry found his residence was Toppenish, Washington, where, he was informed, he was night watchman; that he forwarded the subpoena to Toppenish, which was there served upon Arthur Meyers by the Toppenish chief of police. The sheriff, upon cross-examination, stated he understood from hearsay that the witness was in Portland in attendance at his father's funeral, but that he was not making his home there; that he claimed to be in Washington where he claimed to be deputy sheriff. It appears the subpoena was served December 1, 1910. Upon being asked:

"Now during the past week or ten days, during the funeral of Mr. Meyers' father, you understood Mr. Meyers was in Portland?"

"A. I understood he had been. I did not understand he was there at that time. I understood since he was there at the funeral. I had served this subpoena, and I had filed it with the clerk to be preserved here, and I didn't know that Arthur Meyers was at his father's funeral or in Portland until afterwards, and I only know that from hearsay."

Mrs. Ferguson, called by the State, testified that she reported the testimony at the first trial, taking the testimony of Arthur Meyers at that time; that she did not have the transcript of the testimony, but had the original notes which were correct. Whereupon, over the objection of counsel for the defendant, she was permitted to read such notes of Arthur Meyers' testimony, which, in substance, were as follows: That he was on the night of the homicide occupying a room over Zinn's confectionery store in a building owned by his father; that his brother, the

defendant, came to his room between twelve and one o'clock at night; that they had some words. Defendant had his feet on some highly prized cushions. The witness asked him to remove his feet therefrom, and he would not do it. He tried to reason with him, and he "got funny." He told him he would either have to take his feet down or he would go out and get somebody to make him do so, stating:

"We wrangled considerable. I went down on the street. I walked up and down on the street a few times and didn't see anybody. I walked down by the White House Restaurant. Mr. Eckhart was in there. I motioned for him to come out. I says: 'George is up in my room, and I cannot do anything with him. I would like for you to come up there and take him out.' I says: 'I don't want him arrested. I just want him taken out.' He went up there with me, and George was asleep. He woke him up, and says: 'George, Arthur wants you out of the room. You had better get up and put on your coat and come on. By the way, I have orders to arrest you on sight.' I spoke up and asked what he was arrested for. He said he didn't know; that Doc. Gibson told him to arrest him when he saw him. George said all right, he would go. He went over and got his coat, and started out with him."

Q. "Where was his coat?"

A. "Hanging up in the partition. The room is a large room. In one end is a partition about eight or nine feet high. It was hanging up on the other side of the partition, the side away from the main part of the room."

Q. "What kind of a coat did he get?"

A. "A black slicker."

1. We do not understand it is contended that there was not a *prima facie* showing made upon the part of the State that the witness Arthur Meyers was residing in Washington at the time the subpoena was served upon him, but it is contended in effect that it should have been shown upon the part of the State that his residence there continued until the date of the trial. From the record it appears that the case was postponed from January

until February, on account of the absence of the witness
Arthur Meyers, that the sheriff exercised due diligence
in searching for the witness, and learned in the ordinary
way that he was in the state of Washington.   From the
testimony of the sheriff it is clear that he did not know
until afterwards that the witness was within the State
at the time he attended his father's funeral in Portland.
It having been shown that the witness resided at Top-
penish, Washington, it would be presumed that such resi-
dence continued until the time of the trial, unless shown
to the contrary.   Section 799, subd. 33, L. O. L.; *Wheeler*
v. *McFerron,* 38 Or. 105, 107 (62 Pac. 1015) ; *State* v.
*Walton,* 53 Or. 557 (99 Pac. 431: 101 Pac. 389: 102 Pac.
173).

2. It is further contended that the testimony of Arthur
Meyers was incompetent, in that it was an infringement
of the constitutional right of the defendant to meet the
witness face to face.   Section 727, subd. 8, L. O. L., pro-
vides evidence may be given on the trial as follows:

"The testimony of a witness, deceased or out of the
State, or unable to testify, given in a former action, suit
or proceeding, or trial thereof, between the same parties,
relating to the same matter"—while Section 1533 pro-
vides:

"The law of evidence in civil actions is also the law of
evidence in criminal actions and proceedings, except as
otherwise specially. provided in this code."

The Constitution of Oregon (Article I, Section 11) pro-
vides that in all criminal prosecutions the accused shall
have the right to meet the witnesses face to face, and the
constitutions of most of the states, as well as the Consti-
tution of the United States, contain similar provisions.
It is held, however, that, where the accused has once
enjoyed the right to cross-examine and confront the wit-
ness at an earlier trial, his constitutional right to meet
him face to face is not violated by the admission of the

testimony of such witness when absent at a subsequent trial. If the defendant is represented by counsel at a preliminary examination, and has had an opportunity to cross-examine witnesses, he has enjoyed his right to meet his accuser face to face, and no objection exists to receiving the testimony. Underhill, Crim. Evidence (2 ed.) § 265; *State* v. *Bowker*, 26 Or. 309, 313 (38 Pac. 124). This question was considered and thoroughly discussed in *State* v. *Walton*, 53 Or. 557 (99 Pac. 431 : 101 Pac. 389 : 102 Pac. 173), where Mr. Justice BEAN, in commenting upon Section 1536, L. O. L., which declares that in a criminal action the testimony of a witness must be given orally in the presence of the court and jury, except in the case of the witness whose testimony is taken by deposition by order of the court as provided in Sections 1513-1519, L. O. L., inclusive, says:

"It relates to the manner in which the testimony is to be given or taken in the first instance, and not to the use which may be made of it after it is once given. The statute was intended to make the general rule concerning the taking of depositions inapplicable to criminal trials; but we cannot think it was designed to abrogate a doctrine so firmly established and generally applied as that of permitting the testimony of a witness given in the manner required by statute to be used by either the State or defense on a subsequent trial, when he has since died or is absent from the State."

Numerous authorities are there collated and cited. It is perhaps a sufficient answer to the contention of counsel for defense to say that the testimony of Arthur Meyers in this criminal action was given orally and in the presence of the court and jury at the first trial, and the defendant at that time had full and fair opportunity to cross-examine the witness and meet him face to face. Under the great weight of authority, and with due consideration to public policy, we do not think that we should say that the defendant, after having been once tried and con-

victed, should go free for the reason that his brother, who was a witness upon the former trial, was for any reason absent from the State, and there was no error in allowing the testimony of the witness Arthur Meyers to be read by the official reporter.

3. The State introduced in evidence the testimony of Sheriff Minto, as to his conversation with defendant relative· to his whereabouts after the shooting, to which exception was taken by defendant's counsel. The sheriff testified that the defendant, after his arrest, voluntarily stated that immediately subsequent to the shooting "he had crossed the street from the city hall and down the alley and down—I don't call to mind the exact place, I understand south of the poor farm. There he went into a small shed and stayed part of the time, and in that vicinity I think he stayed until the next night. He then started east toward Silver Creek Falls, stopped at Mr. Luthey's place the next morning for his breakfast, and got on a wagon going toward Silver Creek Falls, and rode a ways, stopped at the store at Victor Point, and followed the road toward Silver Creek Falls until he got nearly over to where the road goes down the mountain. There he turned toward Sublimity, went to, I think, about Union Hill, where he got on another wagon, rode through Sublimity, down through the hills and struck the railroad track at Marion; got on the train and went as far south as Albany; got on the next train, come back, got off at Marion; then went through the hills toward the Steiwer place down on the old Jefferson road toward Salem. From there he went across south of Salem toward the Feeble-Minded Home, out by the asylum, and down towards Pratum. He told me he had made his mind up to come and give himself up, I think he said on Wednesday, I ain't sure about that point. * * He had come into the town, and come within three or four blocks of the courthouse with the intention of coming in, but got frightened

and turned back. Then went out on the road towards Pratum, where he met Mr. Larden, with whom he was acquainted, and went home with him. There he stayed one night, I think two days if I remember right, and agreed to come in with Mr. Larden in the buggy, which he did." Concerning this testimony the court, over the objection of counsel for defendant, in regard to admissions, instructed the jury as follows:

"There is some testimony in this case about what the defendant has said about the matter in controversy. What a party has said by word of mouth and admitted against himself is termed in law 'oral admissions.' In the examination of this kind of testimony you must proceed with caution, for the defendant himself may have been misinformed, or may not have clearly expressed his meaning, or the witness may have misunderstood him, or it may be that the witness who testifies to the admissions by even unintentionally altering a few of the expressions really used caused an effect to the statement clearly at variance with what the defendant actually did say. On the other hand, if you can see from the evidence that the alleged admissions were clearly and understandingly made by the defendant, that they are precisely identified, and that the matter is correctly, properly and accurately reported by the witness, you are authorized to consider such admissions for what you may deem them to be worth against the defendant. In reaching such a result, you must for the reason already given proceed with caution."

The objection was based upon the contention of counsel for defendant that there was no testimony in the record of any statement of the defendant inconsistent with his innocence; that is, there were no admissions in the case upon which to base such instructions. This, in effect, raises the question of materiality of evidence as to the flight of the accused after the homicide. The conduct of defendant, when an attempt is made to arrest him shortly after the commission of an offense, properly is allowed to be proved for the purpose of showing his criminal intent. It may be shown by witnesses or by

questions put to the accused on his cross-examination that he attempted flight, or by concealment or other means attempted to escape arrest, a circumstance which is to be considered by the jury, the sole judges of its weight and sufficiency, and of the motives prompting the flight. Underhill, Crim. Evidence, §§ 117, 118, 119; *State* v. *Osborne,* 54 Or. 289 (103 Pac. 62). There was evidence against the defendant upon which to base this instruction, and we think the question was fairly submitted to the jury.

4. It is also urged that the court erred in giving the instruction, "a witness false in one part of his testimony is to be distrusted in others," for the reason, it is contended, that the witness must be willfully false in part of his testimony before he shall be distrusted in others; this being the statutory presumption. Section 868, subd. 3, L. O. L., provides "that a witness false in one part of his testimony is to be distrusted in others." In Words & Phrases, 2655, it is said: "The word 'falsely,' as used in the statutory provision that if the witness has, in the opinion of the jurors, sworn falsely in any material respect, his testimony is not to be accepted and acted on without great caution, is not the equivalent of 'mistakenly' and the omission or insertion of the word 'willfully' before the words 'sworn falsely' would not change the effect of the language in a charge"—citing *People* v. *Righetti,* 66 Cal. 184 (4 Pac. 1063, 1185) ; *People* v. *Luchetti,* 119 Cal. 501 (51 Pac. 707). The court gave the instruction in the language of the statute (*Simpson* v. *Miller,* 57 Or. 61: 110 Pac. 485: 29 L. R. A. [N. S.] 680), and also in the language requested by defendant's counsel. Seldom, indeed, is there a case of this kind tried where there is not a conflict of testimony. We do not think this is an exception, and there was no error in giving the instruction.

Sig. 18

5. It is further urged that the court erred in giving the following instruction:

"Some testimony has been admitted to your hearing respecting the reputation and character of the defendant as a peaceable and law-abiding citizen. This testimony is admitted for the purpose of strengthening and aiding the presumption of innocence. The obligations of the law rest alike on good citizens and bad ones, and if, after considering all the evidence under the instructions of the court as to the law, you believe beyond a reasonable doubt that the defendant is guilty of the crime of murder in the second degree, or manslaughter, you will so declare by your verdict, although heretofore the defendant may have had ever so good a character or reputation."

It is claimed the effect of this instruction is to take away from the jury the consideration of the previous good character and reputation of the defendant. That particular portion of the charge to which objection is made is: "The obligations of the law rest alike on good citizens, and bad ones," etc. Counsel suggests that the jury is told in effect that, if it believes from the evidence the defendant is guilty, it must convict him, notwithstanding he may have had "ever so good a character or reputation." That it is in conflict with the rule that the good character of the accused may create a reasonable doubt of guilt, but we do not so understand the purport of this instruction. While it does instruct the jury that, if it believes from the evidence beyond a reasonable doubt that the defendant is guilty, it should so declare by its verdict, the instruction does not eliminate the evidence in regard to good character, but simply charges the jury that, whatever the defendant's previous good character or reputation, nevertheless if all the testimony, including that in regard to good character, shows him to be guilty beyond a reasonable doubt of the crime charged, the jury by its verdict should so find. This matter in our opinion was properly submitted to the jury.

6, 7. It is also further alleged that the court erred in instructing the jury that "if Eckhart was a policeman of the city of Salem, he was therefore a peace officer, and as such peace officer had authority to make arrests without a warrant for violations of the city ordinances, or the laws of the State of Oregon, occurring in his presence, or for any felony, although not committed in his presence. If Eckhart, being a policeman, arrested the defendant, it is presumed that Eckhart's official duty as to such arrest was regularly performed, but this is a disputable presumption, and may be overcome by other evidence." Counsel for defendant contends that this instruction is erroneous for the reason that it appears in the record that "it is admitted that Thomas Eckhart on the evening he was shot was a night police officer of the city of Salem; that he had no warrant for the arrest of George Meyers, the defendant, neither did he have orders from the chief of police or sheriff, or any superior officer, or any one else, unless it be Arthur Meyers." And it is contended that the jury should have been instructed to the effect that Thomas Eckhart was a police officer, and that under the stipulation and admission the arrest of George Meyers, under the circumstances, was an unlawful arrest. In addition to the instruction objected to, the court upon this point instructed the jury as follows:

"Peace officers must obey the law describing the limits of their authority. They have no right to make arbitrary arrests not sanctioned by law, and, if a peace officer makes an unlawful arrest without cause, his official character as a peace officer will not protect him further than that if an arrest is made by a known officer, and nothing is to be reasonably apprehended beyond a mere temporary detention in jail, resistance cannot lawfully be carried to the extent of taking life. If the defendant was in a place where he had a right to be, and was not disturbing the peace, or otherwise violated the law, Eckhart would have no right, without a warrant, to arrest him or eject him from the place. An arrest under such circumstances

would be an unlawful arrest. An unlawful arrest made by even a peace officer without a warrant or other authority of law would amount at least to an assualt upon the person arrested, which such person would have a right to resist under the law of self-defense, the same as an assault by any individual not a peace officer."

It would seem that the purpose of the first part of the instruction objected to was to advise the jury that the policeman was a peace officer. To comply with the contention of counsel, it would be only necessary to change this to, "Eckhart being a policeman in the city of Salem, he was therefore a peace officer." We think the instruction given was in effect as contended it should be by counsel. In the latter part of the instruction the language is, "being a policeman." The charge should be considered as a whole. The burden of the objection, however, appears to be that the court failed to instruct the jury that the arrest of George Meyers, under the circumstances, was unlawful, as shown by the stipulation above quoted, from an examination of which it will be seen that it was admitted that Eckhart was an officer of the City of Salem; that he had no warrant for the arrest of defendant, or any orders from any one, except Arthur Meyers. It does not, however, in our opinion go to the extent of admitting that the arrest of defendant was an unlawful arrest, as described by the court in its instructions, to which no exception was taken, but leaves this to the jury. The stipulation does not extend to the conduct of defendant in the presence of the officer. It is true there may be no evidence tending to show that defendant was violating any law or ordinance, except the indirect or circumstantial evidence. We do not think the court was required to instruct the jury as to whether or not there was really any cause or necessity for defendant's arrest by the police officer. The court could not go to the extent of instructing the jury that the arrest was an unlawful one, without going beyond the

facts as stipulated. The instructions given upon this·
point were fair and favorable to the defendant, and, taken
as a whole, we find no reversible error therein.

The defendant has had the benefit of two trials; and,
finding no error in the record, the judgment of the lower
court must be affirmed, and it is so ordered.

AFFIRMED.

Mr. Justice BURNETT, having once tried the case in the
lower court, took no part in this opinion.