Argued June 29, reversed July 28, 1914.

NETTER *v.* EDMUNSON.

(143 Pac. 636.)

</div>

**Evidence—Opinion Evidence—Competency.**

1. On an issue whether hops complied with a contract requiring them to be of first quality, of sound condition, good and even color, fully matured, but not overripe, flaky, cleanly picked, properly dried and cured, free from sweepings and other foreign matter, not affected by spray or vermin damage, and not the product of a first year's planting, the testimony of a chemist as to the amount of resin in the hops and its effect on the supposed brewing value was incompetent and irrelevant.

**Evidence—Opinion Evidence—Competency.**

2. Under Section 725, L. O. L., providing that evidence shall be relevant to the questions in dispute and collateral questions shall be avoided, but it is within the discretion of the court to permit inquiry into a collateral fact when such fact is directly connected with the

question in dispute and is essential to its proper determination, where the issue is the sufficiency of hops to comply with a contract, testimony of a chemist as to the accuracy of the ordinary method of determining the quality of hops, which method was used by witnesses for the adverse party, was incompetent.

**Sales—Actions for Price—Instructions.**

3. Where a contract to supply hops required that they be of first quality, of sound condition, good and even color, fully matured, properly dried and cured, and free from vermin damage, the court should have instructed that if the hops were affected by vermin damage, not of good or even color, fully matured, cleanly picked, properly dried or cured, to the extent that defendants could not furnish the required amount free from such defects, then the hops were *not of the quality* described in the contract.

From Lane: JOHN S. COKE, Judge.

This is an action by Marcus J. Netter and Max Wolf, partners doing business under the firm name of Klaber, Wolf & Netter, against J. M. Edmunson and M. J. Edmunson. From a judgment in favor of defendants, plaintiffs appeal. The facts are stated in the opinion of the court.    REVERSED AND NEW TRIAL ORDERED.

For appellants there was a brief over the name of *Messrs. Williams & Bean,* with an oral argument by *Mr. John M. Williams.*

For respondents there was a brief over the names of *Messrs. Woodcock, Smith & Bryson* and *Mr. L. R. Edmunson,* with an oral argument by *Mr. A. C. Woodcock.*

Department 2. MR. JUSTICE McNARY delivered the opinion of the court.

This is an action to recover advances made by plaintiffs to defendants, by virtue of a contract for the purchase of 30,000 pounds of hops, grown during the hop season of 1912. Defendants are engaged in the culture of hops near the town of Goshen, in the county of Lane. In May, 1912, plaintiffs and defendants en-

tered into a contract for the purchase and sale of hops,
at the agreed price of 25 cents per pound.   Conform-
ably to the written agreement, plaintiffs advanced to
defendants the sum of $3,000 for the purpose of culti-
vating and harvesting the crop.   Following an inspec-
tion of the hops in October, plaintiffs refused to accept
the hops, claiming that they were inferior in quality
to those specified in the contract.   Defendants in their
answer allege that they produced hops sufficient in
quantity and quality to satisfy the terms of the con-
tract which they tendered to plaintiffs, but that they
refused to accept the hops, and subsequently aban-
doned the contract.   As a separate answer and by way
of counterclaim, defendants assert that in the spring
following, they sold the hops for 12 cents per pound,
which was the reasonable market value of the hops,
thereby sustaining a loss of $3,900.   The jury awarded
defendants a verdict for $900, being the contract value
of the hops in excess of the sum for which they sold,
less advances, aggregating $3,000.   The very pith of
this controversy arises over the quality of hops con-
tracted to be produced by defendants and delivered
to plaintiffs.   The provision of the contract covering
this feature of the litigation is as follows:

"The said hops covered by this instrument shall be
of first quality, i. e., of sound condition, good and even
color, fully matured, but not overripe, flaky, cleanly
picked, properly dried and cured, and free from
sweepings and other foreign matter, and not affected
by spraying or vermin damage.   Said hops shall not
be the product of a first year's planting."

The assignments of error are 18 in number, but with
most of them it will not be necessary separately to deal,
as they shade one into another and can be properly dis-
posed of, by a consideration of the principles of law

applicable thereto.   At the trial of the case, plaintiffs produced nine experienced hop buyers, who after qualifying as experts as to the quality of hops, testified in perfect unison of opinion that the hops grown by defendants and offered to plaintiffs were not of the quality defined in the contract, but were unsound, not of even color or fully matured, uncleanly picked, improperly dried and cured, and were affected by vermin damage.   Preceding the delineation of the character of the hops, the contract contains a statement that they shall be of "first quality."   Upon this phase of the case, plaintiffs' testimony ran about as follows, taking an excerpt from Mr. Hall V. Bolam's evidence as a typical illustration:

"Q. Can you tell the jury what constitutes a choice or first quality hop?

"A. Yes.

"Q. You may do so.

"A. In my judgment what would constitute a choice hop is a hop bright in color, whether green or yellow is immaterial, but the hop should have a brightness and shine; it should be soft in texture as you feel it in your fingers—it should not be of a harsh feeling; it should be rich in lupulin.   Lupulin is the pollen contained in the center of the fully matured hop and is its chief ingredient.   Another characteristic of the hop which a great many overlook is flavor.   Choice, prime or medium, in my opinion, depends wholly upon the flavor of the hop.   But the two things generally follow one another.   In other words, in my humble judgment, the real expert of a hop can tell by the look practically what its other constituents are.   It will have that rich, velvety look, which I would roughly explain is the choice hop.   It should also be free from stems and leaves.   I will explain to the jury that the chief quality of the hop is that velvety richness, and the presence of flavor and lupulin, so you will understand that the leaves and stems are entirely useless to the brewer. The mold which has been referred to here to-day is a

characteristic which is very deleterious from a brewing point of view. The expert beer drinker and the expert brewmaster can always detect, or can practically always detect, the presence of moldy hops. It sets up in a slight degree in the fermenting process a kind of a fungus growth which can be detected afterward when you are drinking the finished article, in other words, the beer.

"Q. State whether or not you had any samples of the hops from his yard in the crop of 1912.

"A. Yes, on the 28th of February last, Mr. Edmunson himself sent me at Salem samples of his crop. That was the first time I had seen samples of the crop.

"Q. Did you examine the samples?

"A. I did.

"Q. State what, if any, defect you found in them?

"A. The first defect was lack of good lupulin. The next defect was poor flavor, which in my opinion was due to faulty curing. I think, without knowing Mr. Edmunson's kilns at all, that he overloaded his kilns, and produced a stewing flavor. The hops had a smoky kind of flavor. In curing, the steam should be gotten away from the hops as rapidly as possible through the cupolas of the dryer. It seemed to me that through overloading of the kilns, or not having heat enough, the hops had a slackish and stewing flavor. It was damaged in the color and also in the flavor of the hops.

"Q. What other defect?

"A. A little mold. In my samples, which I did not draw myself—they were sent me by Mr. Edmunson— there was not a very great amount of mold. But the hop was not a fully matured hop. It seemed to me to have been matured—to have been picked too soon.

"Q. State whether or not the hops that he sent you were first quality hops?

"A. No, sir; they were too dull in color and too poor in flavor and too lacking in the quality of lupulin to which I have referred.

"Q. Judging from the samples sent you, what quality would you consider them?

"A. I would grade them a medium grade hop on last year's grading of hops."

Defendants in their behalf, produced as a witness, Mr. Bert Pilkington, a chemist engaged in research work in the Agriculture College at Corvallis, who testified that he had made a chemical analysis from samples of the hops grown by defendants, and that the hops contained resins of sufficient quantities to make them suitable for brewing purposes. In the face of strenuous objection by counsel for plaintiffs the testimony was given to the jury. The objection to the testimony takes a wide range, but may be embraced under the general statement that the method employed by the witness to test the hops was a novel one, not calculated to arrive at the quality of the hops described in the contract, in that it assumes the theory that the quantity of resin in the hops determines their quality.

1. Clearly to grasp the nature of the objections interposed, we deem it prudent to quote certain portions of the evidence. After reciting that he was a graduate chemist of seven years' experience, the witness in response to the question, "Did you examine samples of the hops that were handed you by him?" said, "I did."

"Q. Did you make Mr. Edmunson a statement of what you found?

"A. Yes, I furnished him an analysis of the hops.

"Q. Explain that.

"A. Total resins means all free resins contained in the hop. I might say—the next figure was 16.24, the soft bitter resin; that is, the supposed brewing value. The difference between 16.24 and 18.15 represents a supposedly worthless value."

"Then I estimated the moisture, and found that it contained 7.50 per cent, and the leaves and stems amounted to 3.62 per cent.

"Q. And the hard resins was how much?

"A. The difference between the total and the total soft resin, something like 1.92 per cent, if I remember right.

"Q. I will ask you from your experience as a chemist in analyzing hops if you are able to say what constitutes the quality of the hops; the market value?

"A. I am able to determine as to what the total per cent value of the hop is to the brewer.

"Q. What is that?

"A. Those two bitter resins in there.

"Q. And that would be how much?

"A. That would be a little over 16 per cent in this sample here, 16.24. * *

"Q. What do you say about the sample you examined from Edmunson's yard as compared to the others, with reference to leaves, stems and so forth? What percentage?

"A. In comparison with other commercial samples we have analyzed, we find that the sample submitted by Mr. Edmunson is what we would class as cleanly picked hops.

"Q. I think you have the percentage of leaves and stems as 3.62?

"A. Yes, I did in this sample here. * *

"Q. Can you tell from your examination and experience that you have had with hops what—we will say Oregon hops for instance—and from your knowledge of the way dealers treat them, and brewers, what would be considered the best quality, the best hop in the locality; what would be considered the grades downward, specifying the names as to quality?

"A. The commercial grades, the way they would rate them?

"Q. Yes.

"A. I might say in explanation that we don't pay any attention to the grading. We made this analysis to see if the analysis would justify the grading.

"Q. From your experience can you say that you know when you analyze a hop and examine it whether it would be a high-grade hop or a low-grade hop?

"A. Yes, I can.

"Q. What do you say about the hops you examined for Edmunson as to their grading?

"A. They are above the average we have examined."

While it is true that in communities where agriculture is the main industry, simple farming methods are parts of common knowledge, yet farming has its more scientific side, and matters frequently arise in the trial of agricultural cases that involve technical knowledge lying outside of the domain of the average jury. So in this case, it was the part of wisdom to permit skilled witnesses to express their opinions regarding the quality of the hops, as an aid to the jury in making their decision. Still caution must always be exercised to prevent these witnesses, howsoever skilled, from trenching upon the province of the jury, and from expressing their opinions upon mere abstract questions of science having no proper relation to the fact in controversy. In the answer to the questions to which objections were made, the witness gave his opinion as "to the supposed" brewing value of the hops indicated by the quality of resin therein. Obviously this character of testimony has no relation to the matter. in issue, namely, did the hops measure up to the standard of quality defined in the contract? An application of scientific methods may have demonstrated that the rejected hops would have made excellent beer, quite equal to those specified in the contract as first quality. Yet the defendants were under a legal obligation to deliver to plaintiffs hops of a kind and quality described in the contract. As a matter of common understanding, hops have a commercial value corresponding to the grade which they occupy, and are bought and sold on that basis. The kinds of grades and the manner of their graduation are known to all engaged in the hop industry and its allied concomitants. Therefore the contract under consideration defined the hops to be produced in terms which must be taken as the yardstick by which to measure their quality. It is

argued that the presence or absence of resin in large quantities affects the soundness of the hops, which was one of the components in the hops agreed to be delivered, and for that reason the testimony of the chemist was competent to go to the jury. We admit the logic that one is the corollary of the other; still the objection remains that the testimony of the witness was not limited to an exposition of that element, but was given to the consideration of the jury upon the question of the quality of the hops. We think the opinion of the chemist was both incompetent and irrelevant, having no proper relation to the facts which the jury were called upon to decide, and should have been excluded therefrom.

2. The next assignment of error relates to the admission in evidence, over plaintiffs' objection, of three questions propounded to the expert chemical witness. The questions will be considered together. They are:

"Q. Now, Mr. Pilkington, you heard the testimony of most of the experts, did you, on this, on the part of the plaintiff?

"A. Yes.

"Q. And heard them describe the methods they used for determining the quality of the hop? Now, from your knowledge from examining hops and testing their quality, what do you say as to the accuracy of such methods as they used in examining the hops?

"A. We found great variations; for instance, as was read there, there was a hop classed as poor that analyzed far above what was classed as medium or fancy. And that was the object of this work, to determine whether any reliance was to be placed in this 'rubbing nose method.' We found in the samples that were submitted to us that they did not agree. There was any latitude of variation. It depends on the man that is judging the hop.

"Q. From your knowledge and experience, about what do you say as to whether it could be relied upon?

"A. I would say that it is not reliable."

It may be said that the "rubbing nose method" is the one in general employment by hop men, to test the quality of the hops. It consists in the use of the senses of smell, touch and sight.

Section 725, L. O. L., reads:

"Evidence shall correspond with the substance of the material allegations, and be relevant to the questions in dispute. Collateral questions shall therefore be avoided. It is, however, within the discretion of the court to permit inquiry into a collateral fact, when such fact is directly connected with the question in dispute, and is essential to its proper determination, or when it affects the credibility of a witness."

Aside from the text-writers and the decided cases, this provision of the statute confines the evidence to the matters in dispute, and prohibits questions which call on a witness for a critical review of the testimony given by other witnesses. The inquiry introduced by the pleadings does not concern any "method" by which any fact can be ascertained or developed, but rather the character of the subject matter specified in the contract. It was, in effect, an attempt to introduce the opinion of the witness as to the value of the evidence of plaintiffs' witnesses. It is far from the province of an expert to make such a comparison. It was for the jury to weigh the evidence and to determine for themselves the credibility of the witnesses, and the value of any method by which facts are attempted to be established, without the obtrusion of opinion evidence. We think error was committed by the court in admitting the testimony: Rodgers, Expert Testimony (2 ed.), p. 60; *Ivins* v. *Jacob,* 67 N. J. Eq. 387 (58 Atl. 941); *Trustees* v. *Cronin,* 86 Mass. (4 Allen) 141.

3. The next error presented on appeal involves the refusal of the court to give certain instructions re-

quested by plaintiffs, to the effect that if the hops were affected by a vermin damage, not of good or even color, fully matured, cleanly picked, or properly dried or cured, to the extent that defendants could not furnish 30,000 pounds, free from such defects, the hops were not of the quality described in the contract. These instructions should have been given. This litigation had its inception in the differences that existed between the contracting parties with respect to the quality of the hops. We think the description of the hops as specified in the contract was determinative of their quality.

Complaint is made of other errors, which we deem unnecessary to consider.

The judgment is reversed and cause remanded for a new trial.      REVERSED AND NEW TRIAL ORDERED.

MR. JUSTICE MOORE, MR. JUSTICE EAKIN and MR. JUSTICE BEAN concur.