Argued May 16, affirmed June 12, 1917.

## WIGAN v. LA FOLLETT.

### (165 Pac. 579.)

**Appeal and Error—Presumption of Error—Exclusion of Testimony.**

1. In the absence of evidence or tender thereof to show former statements inconsistent with witness' testimony as allowed by Sections 861, 864, L. O. L., it cannot be presumed on appeal that any such testimony was excluded to appellant's prejudice.

**Witnesses—Corroboration by Unsworn Statements.**

2. A witness' former statement not under oath was not competent under Sections 861, 864, L. O. L., allowing a party to show former inconsistent statements of his witness, to strengthen his evidence given in court, which was weak, although not adverse or prejudicial, but merely unsatisfactory to defendant.

    [As to proof of prior contradictory statements by witness, see note in 82 Am. St. Rep. 39.]

**Sales—Construction of Contract—Sale or Option.**

3. Agreement relating to raising of hops by defendant and purchase thereof by plaintiff, held to be a mutual agreement, and not a mere option in plaintiff's favor, and binding plaintiffs to accept the crop if of specified quality, although the quantity was less than that named in the contract.

**Sales—Construction of Contract as a Whole.**

4. In construing contract of sale, the whole agreement is to be considered, and not merely one clause of it, in the light of prevailing

conditions and circumstances within parties' contemplation at the time of execution.

**Sales—Question for Jury—Conflicting Evidence.**

5. Where evidence was conflicting as to quality and inspection of hops which plaintiff had contracted to purchase, such questions were for the jury.

**Sales—Delivery—Necessity of Notice by Seller.**

6. Contract provision requiring seller to give ten days' notice of proposal to deliver was rendered ineffectual by the buyer's going to place of delivery and inspecting and refusing the crop.

**Sales—Delivery—Necessity of Tender by Seller.**

7. Where buyer upon inspection rejected goods, it was unnecessary for a seller to tender goods and load same as specified by contract, since this was to be done after acceptance as the buyer might direct.

**Trial—Instruction—"Construction" of Contract.**

8. Instruction that jury should give terms of contract for purchase of hops "such a reasonable construction" as placed upon them by persons engaged in that business, *held* not erroneous, the word "construction" referring to the evidence of the different witnesses, and not leaving to the jury the construction of the contract regardless of evidence.

**Sales—Action on Contract—Instructions—Inspection.**

9. Instructions submitting disputed fact as to whether buyer of hops had reasonable opportunity for inspection *held* proper.

**Sales—Extent of Buyer's Inspection.**

10. If buyer rejected hops after partial inspection, seller was not obliged to offer further opportunity for inspection.

**Trial—Instructions—Cure by Other Instructions.**

11. An instruction that seller could recover difference between amount realized from sale of hops after buyer's refusal to accept and the contract price, *held* not erroneous as giving the seller the right to sell hops for small fraction of their value when construed with other instructions.

**Sales—Buyer's Refusal to Accept—Seller's Choice of Remedies.**

12. Upon buyer's refusal to accept goods, the seller may keep the property subject to buyer's order after making tender thereof and sue for balance of purchase price, or may sell goods for best price obtainable and recover difference between amount obtained and contract price.

From Yamhill: HARRY H. BELT, Judge.

This is an action by the firm of Wigan, Richardson & Company, a partnership, against C. M. La Follett and J. D. Isham to recover the advances made by plaintiffs to the defendants under a contract for the sale

and purchase of a certain grade and amount of hops:
The plaintiffs being dissatisfied with the amount of the
judgment they recovered in the lower court, have
appealed.    Affirmed.

Department 2.    Statement by MR. JUSTICE BEAN.

On account of the failure of the defendants to raise
the quantity and quality of hops described in a certain
contract of sale, plaintiffs brought this action to re-
cover the sum of $2,100, advances made by them to the
defendants for the purpose of raising the hops.    The
agreement was executed March 10, 1913, and the mate-
rial part necessary to detail here provided that the
defendants, mentioned therein as the "vendor," should
complete the cultivation of about 20 acres of land then
set out to hops on the farm of defendant C. M. La Fol-
lett, situated at Wheatland, Oregon, harvest, cure, and
bale the hops grown thereon in the years 1913, 1914,
1915, 1916 and 1917, in a careful and husbandman-like
manner, bargain and sell, and between the first and
thirty-first days of October of such years deliver to
the plaintiffs, designated in the contract as the "pur-
chaser," at the agreed price of 14 cents per pound,
30,000 pounds of hops to be grown upon such prem-
ises "in bales of about 185 to 205 pounds each, in new
24-ounce bale cloth five pounds tare per bale to be
allowed, in entire lots f. o. b. boat, at Wheatland, Ore-
gon," as the purchasers might direct.    Such hops
were not to be of the first year's planting nor affected
by spraying or mold, to be of good color, fully matured,
cleanly picked, free from damage by vermin, and in
good order and condition, otherwise known as "prime
quality," and the purchasers were to have preference
and selection both as to the quantity and quality over

all other persons who might thereafter make contracts in relation to said hops. It was also stipulated:

"That the vendor shall serve notice in writing on the purchaser, or his authorized agent, at Salem, Oregon, at least ten days before the date on which the vendor proposes to tender the delivery of said hops; but such notice shall not be sent until the entire lot is actually in bale and ready for delivery."

The purchasers agreed to buy 30,000 pounds of said hops and pay fourteen cents for each pound thereof, less advances made and interest thereon, conceding the right of the plaintiffs to inspect the same before acceptance, and of accepting

"any part less than the whole of the hops so bargained should for any cause the quantity of hops of the quality, character, and kind above described and which shall be raised, picked and harvested from said premises and tendered to him for acceptance be less than the amount bargained for."

It was further provided that to enable the vendors to cultivate and harvest the crop, seven cents for each pound of hops which might be grown upon said lands, not exceeding $2,100 of the purchase price, should be advanced, $600 about April 1, and $1,500 on or about September 1, for each contract year. Paragraph V of the contract is in part as follows:

"The parties hereto further agree that should any breach be made in the terms of this contract by the Purchaser, the Vendor not being in default, the Vendor may recover from the Purchaser, as liquidated damages, a sum equal to the difference between $4200.00 and the value of Thirty (30,000) thousand pounds of hops of the quality and in the condition above specified and hereby contracted, at the market price thereof in Salem, Oregon, on October 31, 1913, 1914, 1915, 1916, 1917, less the amount of all advances made by the Purchaser to the Vendor by the terms of this agreement,

with interest thereon at the rate of six per cent per annum, and the Purchaser agrees to pay the said damages on demand, and should any breach be made in the terms of this contract by the Vendor, the Purchaser not being in default, the Purchaser may recover from the Vendor, as liquidated damages, a sum equal to the difference between $4200.00 and the value of Thirty (30,000) thousand pounds of hops of the quality and in the condition above specified and hereby contracted, at the market price thereof in Salem, Oregon, on October 31, 1913–14–15–16–17, and in addition thereto all moneys which the Purchaser may have advanced to the Vendor in pursuance hereof and interest on the advances as above provided, and the Purchaser agrees to pay the same upon demand [here follows a provision that the purchasers shall have a lien upon the hops as security for the advances which they may make and for such damages as they may sustain by reason of the default of the vendor and authorizes them to foreclose the same as a mortgage if such default be made]; but the Vendor shall not be responsible for any default in the provisions of this contract, except to repay advances and interest, by reason of the shortage of the crop of hops to be raised upon said premises, if such shortage be occasioned by unfavorable seasons and could not be, for this reason, prevented by him.

"Provided, however, that nothing in this agreement contained shall be construed as a waiver by either party of the right to sue for the specific performance of this agreement, or as the exclusion or waiver of any other right or remedy which such party may have at law or in equity, or which may be vouchsafed him by this agreement. * * *"

In pursuance of this contract plaintiffs advanced to defendants the sum of $600 on April 1, 1914, and $1,500 on September 1, 1914. In that year defendants raised and harvested from the farm described 28,085 pounds of hops. The plaintiffs claim that these hops were not of the quality specified in the contract, but

were moldy, not cleanly picked, not of good color, and
were broken and the product of the first year's plant-
ing; that they were of the grade designated by the hop
trade as "commons" and "mediums." After the
hops were baled and stored in defendant La Follett's
warehouse the agents of the plaintiffs went to his
farm for the purpose of inspecting and, as they con-
tend, of accepting and paying for the hops. They in-
spected eight samples at this time which, according
to their contention, proved to be uncleanly picked,
broken, moldy, and not of the quality described in the
agreement. They assert that further privilege of in-
spection was denied them unless they would consent
to accept the whole of the hops. Plaintiffs duly de-
manded a return of the $2,100 which was refused by
the defendants. Consequently, on November 4, 1915,
plaintiffs commenced this action setting forth the con-
tract, asserting the breach of the same, the advances
made, the failure of the defendants to raise the qual-
ity or quantity of hops specified therein and their fail-
ure to permit the plaintiffs to inspect the hops.

The defendants filed an answer admitting the ad-
vances, denying that the hops did not comply with the
quality stipulated in the contract, or that they refused
to permit the plaintiffs to inspect said hops, and deny-
ing any failure on their part to fulfil the terms of the
agreement, and alleging as a further answer and coun-
terclaim that they fully performed the contract on
their part and produced 28,085 pounds of hops; that
plaintiffs inspected the same on October 31st of that
year and arbitrarily and wrongfully rejected them,
after which the defendants sold the hops at the best
price obtainable, to wit, $1,936. They further allege
that they sustained general damages in the sum of
$1,000; that they were entitled to a commission of $140

for selling such hops, and pray for a judgment of $1,050.90.

A reply was filed putting in issue the allegations of the answer. The action was tried to the court and jury resulting in a verdict in favor of the plaintiffs for $104.10. From a judgment entered thereon plaintiffs appeal, assigning errors.        AFFIRMED.

For appellants there was a brief over the name of *Messrs. McNary, Smith & Shields,* with oral arguments by *Mr. John H. McNary,* and *Mr. Roy Shields.*

For respondents there was a brief over the names of *Messrs. Carson & Brown* and *Messrs. McCain, Vinton & Burdett,* with oral arguments by *Mr. Thomas Brown* and *Mr. W. T. Vinton.*

MR. JUSTICE BEAN delivered the opinion of the court.

The first contention made by the plaintiffs is that the court erred in its refusal to permit W. B. Magness, a witness for the plaintiffs, to answer a question asked for the purpose of laying the foundation for showing that the witness had made contradictory statements. Referring to the time of the inspection of the hops in question this witness testified as follows in answer to interrogatories by plaintiffs' counsel:

"Q. You may state whether or not there was mold in this sample?

"A. There was a light trace of mold, three or more berries.

"Q. Did Mr. La Follett look at this sample?

"A. Not that I know of. * *

"Q. How many berries did Mr. Durbin show you that were moldy?

"A. Two or three, I couldn't say exactly. * *

"Q. Didn't Mr. Durbin show you off the top of the sample, some hops that were moldy?

"A. I couldn't say whether he showed me hops off the top or whether he split that sample, I couldn't say. I forget.

"Q. Didn't you tell me yesterday about noon in the office of Mr. Conner of this city, there being present Mr. Shields, Mr. Durbin and myself and Mr. Conner's stenographer, that Mr. Durbin showed the samples that he drew, the last sample rather, and asked you to look at it and that you did look at this sample and you found lots of black mold in the top of it.

"A. No, I never told you I found lots of black ——."

Objection being made by counsel for defendants to such question the court sustained the same. The witness had, however, practically answered it and such answer was not withdrawn from the consideration of the jury, nor was any motion made to strike out the same. It is the contention of the plaintiffs that they were surprised by the unfavorable impression created by the last answer of the witness; that the purpose of the question was twofold: first, to refresh the mind of the witness in order that he might correct his testimony or, second, if denied, to permit the plaintiffs to produce other evidence excusing their mistake in calling him, and thereby destroy the effect of his adverse testimony.

The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence and may show that he has made at other times statements inconsistent with his present testimony as provided by Section 864: Section 861, L. O. L.

1, 2. Under the conditions disclosed by the record it would seem that the plaintiffs would have been entitled to other evidence, if such could have been produced, to show that the witness had at the time indicated made a statement inconsistent with the testimony he had

given. In the absence of such evidence or tender thereof it cannot be presumed that there was testimony excluded to the prejudice of the plaintiffs. Error is not inferred. But there is a stronger reason why no error appears in this connection. The statement of the plaintiffs' witness, made at another time and not under oath, was not competent to strengthen the evidence given on the stand which was weak though not strictly speaking adverse or prejudicial to the plaintiffs. It was unsatisfactory to the plaintiffs. The witness testified that he saw "a light trace of mold on three or four berries." This did not serve as a foundation for the introduction of unsworn declarations made at another time by the witness, who was not a party to the action, as direct proof to substantiate the fact that the hops were affected by a lot of black mold. To admit such declarations would be going farther than the code intends or permits. This question is fully discussed in the following cases: *Langford* v. *Jones,* 18 Or. 307, 326 (22 Pac. 1064); *State* v. *Steeves,* 29 Or. 85, 103, 104 (43 Pac. 947); *Dillard* v. *Olalla Min. Co.,* 52 Or. 126, 134 (94 Pac. 966, 96 Pac. 678); *State* v. *Yee Gueng,* 57 Or. 509, 515 (112 Pac. 424); *Rhodes* v. *State,* 128 Ind. 189 (27 N. E. 866, 25 Am. St. Rep. 429). There was no error in the ruling of the court in this respect.

3. The second and third assignments of error relate to the refusal of the court to strike out all evidence in support of the defendants' counterclaim and to eliminate the same from the consideration of the jury and the refusal of the court to direct a verdict in favor of plaintiffs as demanded in the complaint. These two assignments may be considered together, because if the defendants' counterclaim fails then the plaintiffs are entitled to the full amount of the advances made.

In the first place the plaintiffs submit that the defendants failed to perform the contract by raising only 28,085 pounds of hops, or less than 30,000, the stipulated amount. By reference to the contract we find:

(1) "The purchaser, to have and there is hereby conceded to him the right of inspecting the same before acceptance and of accepting any part less than the whole of the hops so bargained should for any cause the quantity of hops of the quality, character and kind above described and which shall be raised, picked and harvested from said premises and tendered to him for acceptance be less than the amount bargained for''; (2) the entire crop, whatever the amount, is mortgaged to secure the advances the purchaser may make, and such damages as he may sustain by reason of the default of the vendors, and the agreement authorizes a foreclosure and allows attorney's fees therefor in the event of such default; (3) the agreement further provides that "the vendor shall not be responsible for any default in the provisions of this contract, except to repay advances and interest, by reason of the shortage of the crop of hops to be raised upon said premises, if such shortage be occasioned by unfavorable seasons and could not be, for this reason, prevented by him."

To begin with it seems that the contract is a mutual one and binds the purchasers to accept and pay for the crop raised on the premises, as well as the vendors to sell the same although there should be less than 30,000 pounds, the maximum amount bargained for. It was a mutual adventure. It is not a mere option in favor of the purchasers. The clause relating to the purchasers' accepting less than the number of pounds named appears to be worded thus in order to provide for the acceptance of such part of the crop raised as is of the quality specified in the contract and for the rejection of the balance.

The clause providing that the seller shall not be responsible for any default, except to repay advances and interest, by reason of the shortage of the crop of hops occasioned by unfavorable seasons and without the fault of the vendors is the closing part of the paragraph containing the various stipulations that should prevail in the event of any breach of the contract, and modifies the whole of such covenants as to a breach on the part of the sellers. The fair intendment of the latter clause is to absolve the vendors from any fault on account of such a failure to raise the full amount named, if they should exercise an ordinary degree of care and skill in the production of the hops and make an honest effort to produce the 30,000 pounds, although the crop might be short of that amount of contract hops. The trial court properly instructed the jury to this effect over the objection and exception of counsel for plaintiffs: See *Livesley* v. *Johnston,* 45 Or. 30, 52 (76 Pac. 946, 106 Am. St. Rep. 647, 65 L. R. A. 783); *Lachmund* v. *Lope Sing,* 54 Or. 106 (102 Pac. 598); *Kinzer Const. Co.* v. *State,* 125 N. Y. Supp. 46; *Stewart* v. *Stone,* 127 N. Y. 500 (28 N. E. 595, 14 L. R. A. 215); *Buffalo etc. Co.* v. *Bellevue Land & Impr. Co.,* 165 N. Y. 247 (59 N. E. 5, 51 L. R. A. 951); *Ontario etc. Co.* v. *Cutting Fruit Packing Co.,* 134 Cal. 21 (66 Pac. 28, 86 Am. St. Rep. 231, 53 L. R. A. 681).

The agreement as to advances refers to "seven cents for each pound of hops which may be grown on said lands and which are by this agreement to him bargained and sold," and then names the maximum amount. Why this surplusage or dual stipulation, if it was not contemplated that less than the larger number of pounds mentioned would be raised and delivered? Moreover, the plaintiffs have by their

own conduct and declarations, as shown by the evidence, placed such a construction upon this part of the contract, for when their agents went to the La Follett farm October 31, 1914, and inspected the hops there was no controversy about the quantity of the crop. The dispute arose over the quality. The plaintiffs, according to the statement they then made, were willing to accept and pay for all the hops which were up to the standard specified by the agreement. It is true that the contract states as a general rule of damages the difference between a certain sum and the market value of the maximum amount of the hops mentioned thereon. In the event of there being a less quantity raised, by computation this rule is easily applied.

4. In making a memorandum of the agreement the parties used a lengthy, ready-made form in print, adapted to nearly all conditions. In construing the same it is not a question as to what one clause of it indicates, but what the whole agreement means, viewed in the light of the prevailing conditions and circumstances which were within the contemplation of the parties thereto at the time of its execution. It is the contention of the plaintiffs that the non-liability clause only refers to the matter of damages which might be claimed by them. According to the construction which we have given to the contract it is incumbent upon the plaintiffs to carry out the same, unless there is a default on the part of the vendors; in other words, if the defendants, as claimed by plaintiffs, should be deprived of the benefit of their contract they would within the meaning thereof become responsible for a default by reason of a shortage of the crop which, as the evidence tended to show could not have been prevented by them, and held

liable for a portion of the penalty. This would not be in accordance with the agreement of the parties.

5. The motion on behalf of the plaintiffs for a directed verdict for the amount claimed by them depended upon the evidence in support of defendants' counterclaim. That introduced on the part of the latter tended to show that during the year 1914 they cultivated, picked, cured and baled in a careful and husbandman-like manner on the premises named in the agreement 28,085 pounds of "prime hops" of the kind specified in the contract and had the same in the storehouses of defendant La Follett at Wheatland, Oregon, in good order and condition, on October 31, 1914; that at this time plaintiffs' agents went to the warehouse and stated to Mr. La Follett on behalf of plaintiffs that "we've come down to take in your hops"; that they inspected the hops, examining samples taken from eight bales; stating they could not take them as they did not suit them and were not up to the contract, but that they would pay two cents more than anyone else for them; that defendant La Follett tendered the hops to the plaintiffs and demanded the money for them; that this offer was refused by plaintiffs who arbitrarily rejected the hops in violation of their contract. Such was the evidence to sustain the allegations of defendants' affirmative answer. The testimony on behalf of plaintiffs, which is in direct conflict with the main part of defendants' evidence, tended to show that the agents of the plaintiffs went to Mr. La Follett's farm on the day mentioned, the last day for the delivery of the hops as per the contract, for the purpose of inspecting, accepting, and paying for the hops in question according to the terms of the contract; that the hops were "dirty picked" and moldy, "not a sprinkling of

mold, but moldy''; that they were not prime hops
but were ''poor mediums to mediums''; that plain-
tiffs' agents stated that they proposed to take all the
hops that came up to the terms of the agreement as
to quality and that they were there for that purpose;
that there were two ways of settling the matter, one
was for plaintiffs to pay two cents a pound more than
any other dealer, or the propositon of absolutely re-
jecting the hops; that they did not accept the hops
for the reason that they did not find any ''prime
hops.'' There were several witnesses and consider-
able testimony on both sides. There was a direct
conflict in the evidence raising a question for the de-
termination of the jury; therefore, there was no error
in the refusal of the trial court to direct a verdict in
favor of the plaintiffs for the amount demanded.

There was also a dispute as to the matter of in-
spection of the hops which stands upon the same foot-
ing as the quality of the crop. The question was
properly submitted to the jury. By their verdict
they found that the hops were ''prime hops'' as speci-
fied in the agreement; that the plaintiffs had a fair
opportunity to inspect them and wrongfully rejected
them, thereby breaching their contract.

There was some evidence, now complained of by
plaintiffs, that some of the hops tendered were ''baby
hops'' or the product of the first year's planting, but
the defendants' testimony indicated that a few hills
were reset where some had died, and the jury found
that the quantity of young hops did not lower the
whole crop below the standard of ''prime hops.''
This disposes of that contention.

6, 7. It is also suggested by plaintiffs that the defend-
ants were required to give them ten days' notice of
their proposal to deliver the hops. This provision was

rendered ineffectual by the plaintiffs going to the place stipulated for the delivery, and inspecting the crop, declaring that they were ready to accept them if they were in accordance with the specifications of the contract. They were there, therefore no notice to bring them to the place would have been of any avail. The evidence on both sides tended to show that the plaintiffs went to the warehouse at Wheatland to inspect and pass upon the quality of the hops, and the only bone of contention involved the quality of the crop. The purchasers agreed to pay for the hops "after the delivery and acceptance thereof by him at Wheatland, Oregon": 4 Enc. Pl. & Pr. 629. If, as the jury found from the testimony, the plaintiffs rejected the hops, it was unnecessary and would have been futile for the vendors to have loaded the same on to the boat. This was to be done after the acceptance, as the buyers might direct. They did not so order: See *Livesley* v. *Krebs Hop Co.*, 57 Or. 352 (107 Pac. 460); *Catlin* v. *Jones*, 48 Or. 158 (85 Pac. 515); *Krebs Hop Co.* v. *Livesley*, 55 Or. 227 (104 Pac. 3).

8. It is insisted by plaintiffs that they were entitled to an instruction to the jury with reference to the quality of the hops. This is granted. The court charged the jury upon this phase of the case as follows:

"This action is brought upon a written contract which has been introduced in evidence, and which the court will consider and construe, and you are bound to follow the construction which the court places upon the written contract, for that is the law, * * Now as to the quality of these hops contracted to be delivered, the contract says that these hops, first, are not to be the product of the first year's planting, second, not to be affected by spraying or mold, third, they should be of good color, fully matured, cleanly picked, fourth, free from damage by vermin, properly dried and

cured, not broken, in good order and condition; otherwise known as prime quality. You are to accept the definition of prime quality as laid down in this contract by the parties themselves. You are, however, to consider these terms as used in this contract in the ordinary meaning and acceptation of those terms. You are to give them such a reasonable construction and meaning as are placed upon them by persons who are engaged in the hop business.''

The plaintiffs criticise the latter part of this instruction and urge that it would have the effect of leaving to the jury the construction of the contract. We do not think the charge taken as a whole would have that effect. In other words, the latter sentence of the instruction containing the word ''construction'' refers to the evidence of the different witnesses in the case who were growers and buyers of hops, several of whom had been in the hop business for a number of years. These witnesses fully explained and discussed pro and con the different classifications of hops, including the kind named in the agreement, so that as applied to the evidence we do not believe it was possible for the jury to misunderstand or be misdirected by the charge which, as we read it, is plain and was proper. The point is not well taken. It was in strict conformity with the rule announced by Mr. Justice McNARY in *Netter* v. *Edmunson,* 71 Or. 604, 614 (143 Pac. 636). This instruction was in substance the same as plaintiffs' request (Assignment No. VI), save as to the latter part of such request which is in conflict with the views we have expressed above.

9, 10. The evidence on the part of the defendants tended to show that the plaintiffs had all the chance to inspect the hops that they desired, and after they had examined samples taken from eight bales they in-

formed defendants they could not take the hops as they were not up to the contract. Defendant La Follett testified in effect that after such inspection and rejection he merely told the agents of the plaintiffs that "if you don't intend to take them I don't want you to go through and cut them up."

The court charged the jury upon this point in substance as follows:

"Under this contract the plaintiffs have the right of inspection of these hops at any time prior to the full performance of this contract. * * * If you find from the evidence that the plaintiffs wrongfully rejected the hops and stated to the defendants that they would not accept the hops, after they had made an examination of a portion of the hops contracted to be delivered, then there would not be any obligation on the part of the defendants to offer a further opportunity for inspection, for the reason that the law does not require a party to do vain or idle things. If you believe, however, that the defendants refused the plaintiffs the right of reasonable inspection of these hops, then your verdict should be for the plaintiffs."

It appears that this disputed fact was fairly submitted to the jury. We find no error in the charge or refusal to instruct.

11, 12. As a rule of damages in the case, over the objection and exception of counsel for the plaintiffs, the court instructed the jury as follows:

"If you believe from the evidence that the plaintiffs wrongfully and arbitrarily refused to accept the hops mentioned in this contract and that such hops were of the kind and character as described in the contract, and that the defendants had performed all the conditions of the contract on their part, then your verdict should be for the plaintiffs in such a sum of money as is equal to the difference between the contract price of these hops less the amount for which the hops resold for in the open market, plus the sum

of money advanced, viz.: $2,100.00; in other words, if you believe the defendants are entitled to prevail they would be entitled as damages to the difference between the sum of money they would have received had the contract been performed and the sum of money which they actually did receive for the hops."

It is claimed by plaintiffs' counsel that under the given instructions defendants were at liberty to sell the hops for a small fraction of their value. But the court further charged to the purport that if the jury should find that there had been a default on the part of the buyers, that the growers had performed all the terms of the contract, that the buyers had refused to accept the hops, and that the hops were of the kind and character described in the contract, then the growers might treat the hops as belonging to the buyers and go upon the market and resell them for the best obtainable price; that it was the duty of the grower in this respect to act in good faith and obtain the highest and best price, and in this connection the jury should consider as to what was the market value of the hops at the time; that the defendants would be obliged to sell the hops at the market value or in excess thereof. Taking the charge as a whole we do not understand the same as argued by counsel. The case of *Daniels* v. *Morris,* 65 Or. 289, 298 (130 Pac. 397), is authority for the instruction given. In that opinion Mr. Justice BURNETT, speaking for the court, said:

"When a buyer refuses to take and pay for property offered by the seller in performance of an executory contract for the sale thereof, the latter has the choice of either of two remedies. He may keep the property on hand subject to the order of the buyer, after making tender thereof, and maintain an action for the balance of the purchase price, or he may sell the goods for the best price obtainable, and if that is

less than the contract price sue the buyer for the difference.''

There was conflicting evidence upon the trial as to the market value. of hops during November and the first part of December, 1914, the testimony concerning which ranged from seven to eleven cents a pound. It is also explained on behalf of defendants that the price being low during the month of November, the market was inactive, and that for a time the defendants were unable to make a sale of the hops.  Their contention also is that after a crop has been rejected by a buyer it is difficult to make a sale thereof, especially in the vicinity of where the hops have been condemned; that Mr. La Follett, who attended to the sale on behalf of the defendants, was unable to make a sale in the Salem market and was obliged to seek a sale in Portland which he succeeded in making the first part of December.  The jury might reasonably believe from the evidence that for the same cause a broker, in making a purchase, would exact a different grading of the product, which would account for the reason why some of the hops in question sold for seven cents, and nine bales for four cents per pound.  The evidence tended to show that a fair endeavor was made on behalf of the defendants to make the best sale possible of the rejected hops, and apparently the jury so found.

From a careful reading and consideration of all the instructions given by the trial court to the jury, it appears that the questions at issue were fairly submitted to that tribunal.  Finding no error in the record the judgment of the lower court is affirmed.

                                        AFFIRMED.


Mr. CHIEF JUSTICE McBRIDE, MR. JUSTICE MOORE and MR. JUSTICE McCAMANT concur.