Argued May 21, affirmed June 18, rehearing granted October 8, 1918.
Argued on rehearing April 2, reversed July 1, 1919.

## STATE *v.* MERLO.*

(173 Pac. 317; 182 Pac. 153.)

**Witnesses—Showing Inconsistent Statement—Party Introducing Witness.**

1. Under Section 861, L. O. L., authorizing the party producing a witness to show he had made statements inconsistent with his testimony, as provided in Section 864, the state could call the attention of its witness to a prior inconsistent statement, together with the circumstances of time and place and persons present, to refresh his memory and induce him to correct his testimony or explain the inconsistency; the things to be avoided being showing his bad charac-

*The question of right to impeach one's own witness by proof of contradictory or inconsistent statements is discussed in note in 21 L. R. A. 426.

On right to impeach one's own witness because he has not testified as expected, where his testimony is not affirmatively injurious, see note in 42 L. R. A. (N. S.) 747.                    REPORTER.

ter, and introducing as substantive evidence unsworn or prior statements of witness.

[As to proof of prior contradictory statements, see note in 82 Am. St. Rep. 39.]

### Criminal Law—Trial—Objections to Evidence.

2. Objection "irrelevant, immaterial, and not in rebuttal" goes to the introduction of the evidence on rebuttal, and does not, as is necessary for review, raise the question of it being evidence of another crime.

### Criminal Law—Trial—Objections to Evidence.

3. Objection "irrelevant, immaterial, and incompetent and not proper rebuttal, and witness has not shown sufficient qualifications," can only be considered on the ground of evidence not being proper rebuttal.

### Criminal Law—Order of Introduction of Evidence—Discretion of Court.

4. Order of introduction of evidence is in the sound discretion of the trial court.

### Criminal Law—Harmless Error—Departure from Code Procedure.

5. Under Section 1538, L. O. L., departure from a mode of proceeding, even if prescribed by the Code, is not ground for reversal unless it appear that substantial rights of defendant have been prejudiced.

### Criminal Law—Recalling Witness—Discretion.

6. Leave to recall a witness being by provision of Section 862, L. O. L., in the sound discretion of the trial court, it is only for abuse thereof that its ruling can be disturbed.

### Criminal Law—Credibility of Witnesses—Instructions—"Falsely."

7. The court need not add the word "willfully" to the instruction prescribed by Section 868, subdivision 3, L. O. L., "that a witness false in one part of his testimony is to be distrusted in others," "falsely" importing this, and not being of the same import as "mistakenly."

### Criminal Law—Appeal—Harmless Error—Constitution.

8. Article VII, Section 3, of the Constitution as amended in 1910, at least accentuates the law as it stood in regard to prejudicial error, in favor of an affirmance unless actual prejudicial error appears.

### ON REHEARING.

### Witnesses—Impeachment of Character of Own Witness.

9. In view of Section 861, L. O. L., a party who produces a witness of bad character cannot show the bad character of that witness and thus relieve himself from the injurious effects of any unfavorable testimony given by such witness.

### Witnesses—Impeachment—Inconsistent Statements.

10. Under Section 861, L. O. L., if the witness fails to testify as he was expected to do, but does not give testimony prejudicial to the

party calling him, then the party producing the witness cannot impeach him by showing prior inconsistent statements.

### Witnesses—Impeachment of Own Witness—Inconsistent Statements.

11. Under Section 861, L. O. L., where a presumably truthful person makes a statement and afterward as a witness makes an inconsistent statement to the surprise and prejudice of the party calling him, then the party calling the witness is not at fault, and should be permitted to repair the damage.

### Witnesses—Impeachment—Inconsistent Statements.

12. In prosecution of wife for killing her husband, testimony of a state witness, who had stated that defendant and deceased quarreled, that he did not know who started the quarrels was not affirmatively prejudicial to the state, and such as to authorize the state, under Section 861, L. O. L., in impeaching the witness by evidence of prior inconsistent statements.

### Criminal Law—Leading Questions—Reversible Error.

13. In prosecution for murder, that the state, after one of its witnesses had stated that he did not know whether defendant wife or the victim, her husband, started quarrels when "they used to quarrel," elicited testimony from the witness that he had made a contradictory statement before the grand jury *held* not to require reversal, in view of Section 1626, L. O. L., as to errors nor affecting substantial rights, and Section 858 as to leading questions; the witness being reluctant.

### Criminal Law—Limited Use of Testimony.

14. Where a party is permitted to refresh the recollection of his own witnesses by directing attention to prior inconsistent statement, the court should inform the jurors that prior statement cannot be considered as substantive testimony.

### Criminal Law—Improper Cross-examination—Harmless Error.

15. Assuming that cross-examination of defendant's witness with reference to whether defendant had the reputation of getting "drunk" was objectionable, answers of witness, "I don't think so," were without prejudice to defendant.

### Witnesses—Quarrelsome Disposition of Accused.

16. In prosecution for murder, where the witness in question had given testimony on direct examination, from which it could be argued that the victim, defendant's husband, was either alone responsible for quarrels with defendant or an aggressive participant, the district attorney was well within the limits of Section 860, L. O. L., when he asked defendant's witness on cross-examination whether the quarrels began when defendant discovered that the husband did not have " lots of money."

### Witnesses—Impeachment—Immaterial Matters.

17. The general rule is that when a cross-examination elicits from a witness matter that is immaterial or irrelevant the party conducting the cross-examination is concluded as to such matter, and cannot impeach the credibility of the witness by showing contradictory statements.

Criminal Law—Erroneous Admission of Testimony—Harmless Error.

18. In prosecution for murder, *held* that defendant was not prejudiced by reason of introduction in evidence of testimony as to her intoxication on the day of the homicide in rebuttal instead of in chief.

Criminal Law—Evidence of Independent Crime—Reversible Error.

19. In prosecution of defendant wife for the killing of her husband, permitting a witness to state what he had heard about the time defendant got a revolver and was going to kill "his uncle" was reversible error.

From Washington: GEORGE R. BAGLEY, Judge.

Department 2.

The defendant, Rosa R. Merlo, was indicted for the crime of murder in the second degree for the killing of her husband, Joseph Merlo. She was tried and convicted of manslaughter, and from the judgment of sentence appeals. The testimony of the plaintiff consisted of evidence tending to show the death of the victim, its cause, the nature of the wounds, the range of the bullet and description of the condition of the premises, of the various threats on the part of the defendant to take the life of her husband, statements of the defendant herself in relation to the homicide and in relation to evidence leading up to it and testimony tending to show the quarrelsome inharmonious life that the couple had led for some time prior to the homicide.                    AFFIRMED.

For appellant there was a brief over the names of *Messrs. Huston & Huston* and *Mr. Harry T. Bagley,* with oral arguments by *Mr. Samuel B. Huston* and *Mr. Bagley.*

For the State there was a brief and an oral argument by *Mr. Edmund B. Tongue,* District Attorney.

BEAN, J.—In the examination of the witnesses for the state, it appears some evidence crept into the record tending to show that at times defendant was in the habit of using intoxicating liquor. Louis Merlo, a witness for the state, being interrogated as to quarrels between the decedent and the defendant, was asked through an interpreter and answered as follows:

"Ask him what they quarreled about?"
Ans. "Every time Rosie drank there was quarrels."
Ques. "Every time Rosie drank there was quarreling?"
Ans. "Yes, sir."

When Letizia Partipillo, a witness for the state, was testifying and was being cross-examined by the attorney for the defense, the following questions were given and the following answers made. Referring to the deceased, the following question was asked:

"Never drank?"
Ans. "We used to drink at the table a little wine but he was never drunk here or in the old country."
Ques. "And Rosie was always drunk?"
Ans. "Yes, sir, especially when she would go to Beaverton or Portland, or to her father's house she would never come home until half-past 1 or 2 o'clock after midnight."
Ques. "And your father never got drunk?"

There was no objection to this testimony, and it is referred to as an introduction or foundation for some of the other evidence in regard to the use of intoxicating liquor by the defendant.

The defense was that the killing was done in self-defense. Upon the trial of the case, the state called as a witness, one Luigi Beggi, who testified that he ate his meals with defendant and her husband; that the defendant and the decedent used to quarrel; that he

did not know who started the quarrel. The witness was then asked by the district attorney:

"Q. Do I understand you to say that you don't know which one generally started the quarrel and when they quarreled?

"A. No.

"Q. You remember of being in the grand jury room, don't you?

"A. Yes, sir.

"Q. When this case was being investigated, you remember that time?

"A. Yes, sir.

"Q. And the grand jury and myself being present, didn't you at that time and place in the first part of November, I think it was, make this statement?

"A. Yes, sir, I know it.

"Q. All the time they had troubles, Rosa all the time started, she started first. Sometimes Joe run outside sometimes. She drink too much."

The defendant by her attorney objected as follows:

"I object to that as being apparently and plainly an attempt to impeach their own witness," and added: "He has not testified to anything against the prosecution and he has simply failed to testify as strongly as was wanted and I do not think they can impeach their witness that way."

These objections were overruled and exception allowed, and the examination by the district attorney proceeded.

"Q. Didn't you say at that time and place?

"A. I think so.

"Q. You say you said that?

"A. Yes, sir.

"Q. Was it true? (This question was again objected to, but the objection was overruled and the witness answered), 'I guess so.'

"Q. Was it not true?

"A. Well, that is true."

It will be seen that the method of examination pursued with the witness served apparently to refresh his memory. No hearsay nor unsworn statements were admitted. Section 861, L. O. L., provides:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in Section 864."

1. The state called the witness and under this section it was entitled, when the district attorney was surprised by the unexpected and unfavorable testimony, to call the attention of the witness to prior statements which were inconsistent with his present sworn testimony, together with the circumstances of time and place and persons present according to Section 864, L. O. L., in order to refresh the recollection of the witness and induce him to correct his testimony or explain the apparent inconsistency, and to ask the witness if he made such previous statements. Whether or not the examination of the witness was strictly within the rule in the cases of: *Langford* v. *Jones,* 18 Or. 307, 326 (22 Pac. 1064); *State* v. *Steeves,* 29 Or. 85, 104 (43 Pac. 947); *State* v. *Yee Gueng,* 57 Or. 509, 512 (112 Pac. 424), there was no attempt to show the bad character of the witness. No unsworn or prior declarations of the witness were admitted. No substantive evidence was received in that manner. These are the shoals to steer clear of in such matters: *Wigan* v. *La Follett,* 84 Or. 488, 496 (165 Pac. 579). None of the fatal results followed. It served as in the nature of a leading question to the witness tending to bring out the truth: *State* v. *Deal,* 43 Or. 17 (70 Pac. 534). There was no reversible error in permitting such examination.

2–5. The most serious contention of the defendant is that: The state was allowed on rebuttal, to offer evidence that the defendant had been guilty of an independent crime. Luigi Beggi was a witness for the state. He was recalled as a witness on rebuttal, and testified through an interpreter, as follows:

"Q. Ask him if he knows anything about the time Rosa got a revolver and was going to kill his uncle?"

The defendant objected to this as irrelevant, immaterial, and not in rebuttal of any issue in this case, the objection was overruled and the exception allowed and the witness answered, "Yes, sir."

"Q. Ask him to tell the jury about that.
"A. Yes, Davy's brother was cleaning land, and Rosa came up and told him, Rosa said if he would not take back the words he said she would shoot him."

There is nothing in this testimony or in the objection thereto, to attract the attention of the trial court to the fact that it was the intention of the district attorney to elicit evidence pertaining to any other crime than that charged in the indictment, or that the witness referred to any threat made by the defendant except against the decedent. In other words, it does not appear that the decedent, Joe Merlo, was not an uncle, or a so-called uncle, of the witness, Luigi Beggi. The testimony interpreted from Italian to English is difficult to understand. As near as we can tell from a careful examination of the evidence, the witness Beggi understood that the question objected to referred to Rosa Merlo's uncle although the gender does not so indicate. It would seem as though the mind of the trial court should have been directed to the objection to the evidence as now made. The objection plainly goes to the introduction of the evidence upon rebuttal:

See *State* v. *Goddard,* 69 Or. 73 (133 Pac. 90, 138 Pac. 243, Ann. Cas. 1916A, 146) ; *Hoag* v. *Washington-Oregon Corp.,* 75 Or. 588 (144 Pac. 574, 147 Pac. 756, 760, par. 6) ; *Filkins* v. *Portland Lumber Co.,* 71 Or. 249 (142 Pac. 578, 579) ; *Shandrew* v. *Chicago, St. P. M. & O. R. Co.,* 142 Fed. 320 (73 C. C. A. 430). The specific objection to evidence that it was not proper rebuttal waives any other objection and no other objection should be considered on appeal: *Ladd & Bush* v. *Sears,* 9 Or. 244; *Hildebrand* v. *United Artisans,* 50 Or. 159, 166 (91 Pac. 542). It would seem unnecessary to observe that before this court can review a ruling of the trial court, such ruling must be made. To suggest the application of the principle is sufficient. It is also complained by defendant that the state was allowed to introduce evidence of other threats by the defendant on rebuttal. The state called in rebuttal one Mike Partipillo, who testified as to threats made by defendant to kill the decedent.

The witness Partipillo testified that upon an occasion at the Good Samaritan Hospital when other people were present he heard Rosa Merlo make certain threats against her husband. These threats had already been testified to by other people who were there at the hospital at the time, on the state's direct case. Partipillo's testimony was merely cumulative. He had been subpoenaed and it was his duty to have been in court at a time when his testimony could have been taken while the state was engaged in putting in its case in chief, but he was not present. He did not arrive in court until the prosecution was engaged in putting in its rebuttal. His testimony was objected to upon the ground that it was not proper rebuttal. When this objection was made the district attorney stated to the court:

"We intended to put this witness on in the direct case but he didn't get out on the train and we rested our case without him."

Upon the statement of the district attorney, the objection was overruled and the court allowed his testimony to be taken.

Mrs. Martha Hansen, a witness for the state, testified in effect that she had met the defendant getting off the train at the station of Santa Rosa a short time before the murder and that at the time the defendant got off she appeared to be in an intoxicated condition. The objection of the testimony is as follows:

"Object as irrelevant, immaterial and incompetent and not proper rebuttal, and the witness has not shown sufficient qualifications to be able to testify."

This is practically the same objection as that made when Beggi was recalled. These objections can only be considered on the ground that it is not proper rebuttal. Therefore, all of this testimony introduced upon rebuttal may be considered at the same time. The order of the introduction of the evidence is within the sound discretion of the trial court. Section 1538, L. O. L., provides:

"Neither a departure from the form or mode prescribed by this Code, in respect to any pleadings or proceedings, nor any error or mistake therein, renders it invalid, unless it have actually prejudiced the defendant, or tend to his prejudice in respect to a substantial right."

Under this section a deviation from the mode prescribed by the Code would not be a ground for a reversal unless it appear that the substantial rights of the defendant have been prejudiced: *State v. Remington,* 50 Or. 99, 102 (91 Pac. 473); *State* v. *Walton,* 50 Or.

142, 152 (91 Pac. 490, 13 L. R. A. (N. S.) 811); *State* v. *Gulliford,* 76 Or. 231 (148 Pac. 876).; Article VII, Section 3, of the Constitution.

6. The permission for recalling the witness Beggi to the stand and receiving the testimony of the witnesses Partipillo and Hansen were matters within the sound discretion of the trial court. And in the absence of an abuse of such discretion, we do not feel authorized to disturb the ruling: Section 862, L. O. L.; *State* v. *Robinson,* 32 Or. 43, 51 (48 Pac. 357); *State* v. *Isenhart,* 32 Or. 170, 173 (52 Pac. 569); *State* v. *Goff,* 71 Or. 352 (142 Pac. 564).

7. Error is predicated upon the instruction of the court to the jury that, "a witness shown to be false in one part of his testimony is to be distrusted in others." Section 868, L. O. L., subdivision 3, requires the court to instruct the jury on all proper occasions:

"That a witness false in one part of his testimony is to be distrusted in others."

It is not necessary that the court should add the word "willfully" to the language of the statute. The word "falsely" as used in the statute, providing that if a witness is found to have sworn falsely in any material part of his testimony he is to be distrusted in others, is not of the same import as mistakenly, and the phrase as used in the statute is of the same meaning as though the word "willfully" were used: *State* v. *Meyers,* 59 Or. 537, 545 (117 Pac. 818); *State* v. *Goff,* 71 Or. 352, 364 (142 Pac. 564); *People* v. *Righetti,* 66 Cal. 184 (4 Pac. 1063, 1185). There was no error in giving this charge in the language of the Code.

8. An extended examination of the testimony is necessary in order to determine whether or not the exceptions taken upon the trial of the cause and now assigned as errors, constitute sufficient ground for a

reversal of the case. After such an examination, and waiving the form and substance of the objection as to evidence of an independent crime, we are of the opinion that the judgment of the lower court should be affirmed; that a remand of the case and a retrial thereof, upon substantially the same testimony would produce the same result. There can be no question but that the amendment of Article VII of the Constitution in 1910 changed, or at least accentuated the law as it stood before in regard to prejudicial errors, in favor of an affirmance of a judgment, unless actual prejudicial error appears.

Finding no reversible error in the record, the judgment of the lower court is affirmed.    AFFIRMED.

McBRIDE, C. J., and MOORE and HARRIS, JJ., concur.

---

Reversed and remanded on rehearing July 1, 1919.

## ON REHEARING.

(182 Pac. 153.)

On petition for rehearing.

In Banc.

Rosa Reghitto Merlo shot and killed her husband Joseph Merlo on October 4, 1915. She was convicted of manslaughter upon an indictment charging her with murder in the second degree, and she appealed from the judgment pronounced by the court.

Joseph Merlo came from Italy to this country in March, 1907, and on June 29th following, he and the defendant, Rosa Reghitto, who is also an Italian, were married. At the time of the marriage she was about

92 Or.—44

30 years of age. She says that prior to the wedding he told her that he was 42 years of age; but she claims that she afterwards ascertained that he was much older. He had four children, by a previous marriage, living in Italy. Joseph sent for his children and they came to this country in 1909 and made their home with their father and stepmother. Subsequently two of the daughters married and became established in homes of their own. Mary Guiso and Letizia Partipillo are the married daughters. Louisa Merlo is the third daughter and Louie Merlo is the son; these two children continued to live with their father and stepmother until the date of the homicide. Two children were born to the defendant and her husband. David Reghitto is the father of Rosa Merlo. Pietro Debenedetti who, for the sake of brevity, will be called Pete, was an employee of the Merlos.

The defendant and her husband were truck farmers, and they lived upon a tract of several acres of land which was owned by the defendant and is located near a railway station called Santa Rosa. David Reghitto lived near Beaverton, a town about two and a half or three miles distant from Santa Rosa.

Joseph Merlo took a wagonload of vegetables to Portland and disposed of them during the morning of October 4, 1915. The defendant went to Portland that morning on the train and arrived there "a little after 9." She says that soon after her arrival she met her husband and that, upon noticing that she looked pale and sick, "he suggested that they go to Garbarino's and take something and you will feel better"; and that they did go to Garbarino's, where she took some Fernet bitters. David Reghitto also went to Portland on the train on the morning of October 4th and arrived

there about 11 A. M. At about 1:20 P. M. the defend-
ant in company with her father boarded an Oregon
electric car in Portland and reached Beaverton about
1:42 P. M. They then went to David Reghitto's home
where, according to the testimony of the defendant
and her father, she drank only a part of a glass of
wine. At 4:07 P. M. the defendant boarded a car at
Beaverton and arrived at Santa Rosa five or seven
minutes afterwards.

Joseph Merlo reached home about 1 P. M. Three
hunters came to the Merlo place early that morning
and they were eating their lunch when Merlo arrived
home with his wagon. Each of these hunters testified
that Merlo was intoxicated when he returned home.
The defendant says that when she came from the depot
Louisa said that she thought that her father "has got
some drink" and that "when he came home from Port-
land he was quarreling mad." However, Louisa
denies making this statement and asserts that her
father was not under the influence of liquor. Pete
likewise says that the decedent was sober when he
came home.

In its case in chief, the state called Letizia Parti-
pillo, Mary Guiso, Louisa and Louie, the four children
of the decedent, Pete and three other witnesses who
testified about frequent quarrels between the defend-
ant and her husband and that the quarrels were always
brought on by the defendant. When asked what they
quarreled about, Louie Merlo stated: "Every time
Rosie drank there was quarrels." A number of wit-
nesses swore that on various occasions they heard the
defendant threaten to kill the decedent; some of these
threats mentioned by the witnesses were made in the
presence of the decedent while others were not made
in his presence.

The defendant, in her case in chief, presented one witness who told about the defendant and decedent coming to the witness' office in Portland and that during an ensuing quarrel between the defendant and her husband the latter "got awful mad at her" and he picked up a heavy cuspidor "and wanted to hit her with it." Another witness testified that on Easter Sunday in 1915 he heard the decedent call the defendant a prostitute. Three other witnesses narrated instances calculated to indicate that the decedent was jealous and that he was an aggressive participant in the quarrels with his wife. Evidence in behalf of the defendant is to the effect that upon three occasions the defendant left her husband and talked about procuring a divorce; on one of these occasions she returned to him only upon his promise to do better. The defendant said that three days after their marriage she and her husband quarreled; that he was jealous, cranky and mean; that he called her "all kinds of dirty names"; that he threatened to kill her many times; that he attempted to kill her four years before the homicide; and that she was afraid of him. In addition to what the defendant said about the representation made by her husband concerning his age, she stated that before their marriage he "told me he leave lots of money in the old country and property; and next he said when I get married I don't get anything."

Louisa Merlo testified that when her father came into the house, after returning from Portland on October 4th, she prepared a meal for him, and that after eating "he went upstairs to bed." According to the testimony of the defendant, when she reached the house she met and talked with Louisa and then went upstairs and changed her clothes. Her husband was lying on the bed asleep but awakened while she was

changing her clothes.   She testified that he then asked
her what time it was and that when she told him that
"it was about half-past 4" and that she had just come
home he accused her of "looking around all day with
your friend in Portland," applied an opprobrious
name to her, tried to catch her and "he said to-day I
am going to fix you."   The defendant says that she
ran downstairs and out through the back door into the
yard.   According to the version given by the defend-
ant, both Louisa and Louie were in the yard and en-
deavored to aid their father by attempting to catch the
defendant, and that she picked up a stick and kept off
the children.   The defendant says that Louisa soon
went "down" to the cabbage-patch where Pete was
working and Louie went either to the barn or to the
tomato-house.   Louie claims that he was in the tomato-
house all the time and did not witness or participate
in the quarrel.   Louisa says that while on her way
from the tomato-house to the cabbage-patch with some
boxes for Pete and when at a point some little distance
from the house she saw her father and the defendant
outside of the house and heard the defendant say: "If
anybody comes near me I hit them on the head."
Louisa insists that she went on down to the cabbage-
patch and that she neither participated in the quarrel
nor even saw or heard any more of it than as already
stated.   The defendant contends that after Louisa had
gone to the cabbage-patch and after Louie had gone to
the barn or to the tomato-house the decedent said:
"To-day I want to get rid of you and your father and
mother and every Reghitto that is born the same place
that I am."   The defendant says she then started to
run down to the cabbage-patch where Pete and Louisa
were but her husband soon caught her and "he threw
me on the porch like an old shoe."   The defendant

claims that she then fled through the back door and
after locking it ran upstairs and took refuge in her
bedroom and locked the only door to that room. The
defendant contends that her husband entered the
house through a window, came upstairs, broke open
the bedroom door and that in order to defend her own
life she shot him. The decedent was shot four times;
twice in one arm and twice in the body. As we read
the record it is admitted by all that Louisa and Pete
were in the cabbage-patch when the shots were fired.
Louie insists that he was in the tomato-house when he
heard the shots; the defendant says, however, that he
was at but outside the house and was attempting to
persuade his father not to break into the bedroom.
Upon hearing the shots Louisa and Pete ran to the
house and Louie says that he likewise ran to the house;
and they all stated that when they reached the house
they found Joseph Merlo lying on the floor in the
bedroom.          REVERSED AND REMANDED.

For appellant there was a brief over the names of
*Messrs. Huston & Huston,* and *Mr. Harry T. Bagley,*
with oral arguments by *Mr. Samuel B. Huston* and *Mr.
Bagley.*

For the State there was a brief and an oral argument
by *Mr. Edmund B. Tongue,* District Attorney.

HARRIS, J.—When presenting its case in chief the
state called Luigi Beggi as one of its witnesses. After
having explained that he had been acquainted with and
had worked for Rosa and Joseph Merlo and that "they
used to quarrel" he was asked: "Do you know what
they quarreled about?" and his answer was "No."
The witness was next asked: "Who seemed to start

the quarrel?'' and he answered thus: ''Well, I don't
know, they started it together; I don't know.''  Sub-
sequent questions asked by the district attorney and
answers given by the witness were as follows:

''Q. Do I understand you to say that you don't know
which one generally started the quarrel when they
quarreled?.

''A. No.

''Q. You remember of being in the grand jury room,
don't you?

''A. Yes, sir.

''Q. When this case was being investigated?  You
remember that time?

''A. Yes, sir.

''Q. And the grand jury and myself being present,
didn't you at that time and place, in the first part of
November, I think it was, make this statement—

''A. Yes; I know it—

''Q. 'All the time they had trouble, Rosie all the
time start it, she start it first sometimes Joe run away
outside sometimes, she drink too much.'

''Q. Didn't you say at that time and place—

''A. I think so.

''Q. You think you said that?

''A. Yes, sir.

''Q. Was it true?

''A. I guess so—

''Q. Was it or not true?

''A. Well, that is true.''

9. The defendant objected to the questions last
above quoted ''as being apparently and plainly an
attempt to impeach their own witness.''  Our statute,
Section 861, L. O. L., does not permit the party pro-
ducing a witness to impeach his credit by evidence of
bad character, but the party producing a witness may
show that such witness ''has made at other times
statements inconsistent with his present testimony.''
That part of Section 861 which prohibits a party from

impeaching his own witness by evidence of bad character is simply declaratory of a common-law rule; and this, like most rules, is based upon a reason. In theory, the ultimate object of every lawsuit is to ascertain the truth. Every person participating in the trial of a lawsuit is supposed to assist in ascertaining the truth so that justice can be administered. The party producing a witness is presumed to know the character of that witness; and since a party, like all others concerned in the trial, is at least supposed to aid in discovering the truth, he is deemed to represent to the court that such witness is worthy of credit or at least is not so infamous as to be wholly unworthy of it. It would be a perversion of the judicial function if an unscrupulous litigant could produce a witness, whom he knows to be unworthy of belief, and then gamble upon the kind of testimony to be given by the witness, with the accompanying right to accept any benefit that might come from favorable testimony taken from a foul and polluted source or to reject and to destroy the testimony, if unfavorable, by showing that the witness is unworthy of belief. A party who produces a witness of bad character cannot show the bad character of that witness and thus relieve himself from the injurious effects of any unfavorable testimony given by such witness. The element of surprise is not supposed to be present, and hence a party must accept the consequences which he himself has brought upon himself by producing a witness of bad character.

Professor Wigmore says that the "conception, that a party calling a witness must not even discredit him, was not enforced as a rule of law until a comparatively late period." (2 Wigmore on Evidence, § 896.) This author gives an interesting account of the origin and growth of the rule and says that the enforcement of

it in the trial of Warren Hastings, in 1788, "seems to have been the immediate cause of its general currency." The rigor of the rule, when applied to prior self-contradictions, has been slowly but surely relaxed during the last century, not only by force of statutes but also by the influence of judicial decisions. Professor Wigmore's treatise on Evidence contains an exhaustive narrative of the origin, growth and establishment of the rule and the processes which in most jurisdictions have brought about a relaxation of the doctrine when applied to prior self-contradictions: Section 896 et seq; Section 1017 et seq. This process of relaxation has naturally resulted in a multitude of judicial decisions. A comparatively few of these decisions have attempted to stem the current of judicial opinion by refusing to relax at all; some have relaxed only slightly; while still others have relaxed much. Whether relaxing much or little, the courts have not always assigned the same reasons for their conclusions. These multitudinous decisions, appearing as they ofttimes do in varying and even contradictory forms and based as they frequently are on different reasons, must always be read in the light of the genesis and subsequent development of the rule now under discussion.

Judicial decisions dealing with prior self-contradictions may be divided into three general classes: (1) Those which prohibit the use of prior self-contradictions for any purpose; (2) those which permit a party to direct the attention of his own witness to a prior self-contradiction, but at the same time refuse to permit proof of such prior inconsistent statement even though the witness denies having made the statement; and (3) those which permit a party to direct the attention of his own witness to a prior inconsistent state-

ment and also allow proof of such prior statement if the witness denies having made the statement. The reported precedents belonging to the second class assign different reasons for their conclusion. Some in general terms declare that a question containing reference to a prior self-contradiction is competent to show surprise; and others in equally general terms say that the question is proper for the purpose of refreshing the recollection of the witness. The cases properly assignable to the third class usually proceed upon the theory that it is competent to prove a prior self-contradictory statement for the purpose of neutralizing the prejudicial testimony of a party's own witness in the event the witness fails to remember or denies having made the prior statement. Cases found in the second class permit a party to take but a single step; for he can do no more than ask the question and whether the witness admits or denies having made the prior statement, the answer concludes the party. If the cases in this class are resolved to their final analysis it will be found that they exclude rather than include the element of impeachment as the primary basic idea; for the avowed purpose of the doctrine of these cases is to show surprise or to refresh the recollection of the witness. Cases belonging to the third class permit a party to take two steps if necessary: (1) To ask the question; and (2) to prove the utterance of the prior inconsistent statement if the witness denies having made it. In some jurisdictions the right to impeach a party's own witness is made absolute, either by judicial decision or by statute; while in others, by force of judicial declaration or legislative fiat, the right is made dependent upon the discretion of the trial judge.

A statute in this jurisdiction confers the right and fixes the conditions under which a party may impeach his own witness by prior inconsistent statements. Section 861, L. O. L., reads as follows:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in Section 864."

10. Although the language of Section 861, L. O. L., is broad and comprehensive, nevertheless a party cannot assert the right to discredit his own witness by the use of prior inconsistent statements unless such witness gives testimony which relates to a material matter and is prejudicial to the party calling him. If the witness merely fails to testify as he was expected to do, or fails to testify as strongly as was expected, or gives testimony which is favorable to neither party, and does not give testimony prejudicial to the party calling him, then the party producing the witness cannot impeach him by showing inconsistent statements. This is the rule which prevails in this as well as in all jurisdictions coming within the third class: *State* v. *Steeves,* 29 Or. 85, 104 (43 Pac. 947); *State* v. *Bartmess,* 33 Or. 110, 113 (54 Pac. 167); *State* v. *Yee Gueng,* 57 Or. 509 (112 Pac. 424); *State* v. *Jennings,* 48 Or. 483, 488 (87 Pac. 524, 89 Pac. 421); *Woodburn* v. *Aplin,* 64 Or. 610, 622 (131 Pac. 516); *Reimers* v. *Brennan,* 84 Or. 53, 57 (164 Pac. 552); *Wigan* v. *La Follett,* 84 Or. 488, 496 (165 Pac. 579); *People* v. *Godwin,* 123 Cal. 374 (55 Pac. 1059); *Sturgis* v. *State,* 2 Okl. Cr. 362 (102 Pac. 57); *Culpepper* v. *State,* 4 Okl. Cr. 103 (111 Pac. 679, 140 Am. St. Rep. 668, 31 L. R. A.

(N. S.) 1166; *Andrews* v. *State,* 64 Tex. Crim. Rep. 2 (141 S. W. 220, 42 L. R. A. (N. S.) 747).

11. Stated broadly, since a party is supposed to know the character of his own witness and having such knowledge should not be surprised at any testimony given by a witness of bad character, a party is not permitted to show the bad character of his own witness and must accept the consequences of his own fault in calling such a witness; but where a presumably truthful person makes a statement and afterwards as a witness makes an inconsistent statement to the surprise and prejudice of the party calling him then the party calling the witness is not in fault and should be permitted to repair the damage.

12. Applying the established rule to the record presented here it cannot be said that the testimony of Luigi Beggi was affirmatively prejudicial to the state. He did not testify as strongly as was expected by the district attorney; but he gave no testimony against the state; and hence the state could not have properly called any of the grand jurors to testify about what was said by Luigi Beggi in the grand jury room. If Beggi had stated that the decedent always or even sometimes started the quarrels the situation would have been different. The essential facts in *State* v. *McDaniel,* 39 Or. 161, 181 (65 Pac. 520), bear some resemblance to the record of Luigi Beggi's testimony; but notwithstanding the similarity in the controlling facts and the ruling made in *State* v. *McDaniel* our conclusion is that the testimony given by Beggi was not such as would have authorized the state to impeach him by evidence of prior inconsistent statements.

13. However, no witness was called for the purpose of impeaching Luigi Beggi. The district attorney did not tell the court that the questions were being asked

for the purpose of laying the ground for impeachment. Indeed, counsel for the state made no statement whatever concerning the purpose of the questions; and the court said nothing, except to overrule the objections. It is true that the defendant objected, claiming that the plaintiff was attempting to impeach its witness; and yet the objection made by the defendant did not necessarily alone and of itself fix and limit the purpose of the testimony. The defendant does not contend that it was incompetent for Luigi Beggi to testify: "All the time they had trouble, Rosie all the time start it, she start it first, sometimes Joe run away outside, sometimes she drink too much"; and yet in the final analysis the witness did that and nothing more. It is true that the testimony was not given until the attention of the witness was first called to a statement made by him in the presence of the grand jury; but it is also true that when his recollection was refreshed, he remembered that he had made the statement and he then affirmed that the statement was true. If it be conceded that the ultimate answer was competent, then the defendant can have no just ground for complaint unless it can be said that the method pursued was objectionable. The testimony finally given was highly important to the state. A mere reading of the questions and answers already quoted at once suggests that the witness may have been an unwilling witness; and it may be that in addition to the suggestion carried by the paper record the appearance and conduct of the witness made it plain to the trial court that Luigi Beggi was a reluctant witness. Moreover, this same witness afterwards testified that on the night of the shooting David Reghitto told him that he would have to give certain testimony and "if you don't I fix you." Here then was a witness whom the court apparently

treated as an unwilling witness and there is much in the record which would seem to justify what appears to have been the opinion of the court. If Luigi Beggi is viewed as a reluctant witness the next question for decision is whether the substantial rights of the defendant were affected. Section 1626, L. O. L., provides that:

"After hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

Our Code expressly provides that "under special circumstances, making it appear that the interests of justice require it" the court may in the exercise of a sound discretion permit leading questions to be asked on direct examination: Section 858, L. O. L.; *State* v. *Ogden,* 39 Or. 195, 202 (65 Pac. 449).

If it be assumed that Luigi Beggi was an unwilling witness and if the questions were asked for the purpose of refreshing the recollection of this unwilling witness, then the ruling of the trial court finds support in our own precedents as well as in parallel cases reported in other jurisdictions: *Langford* v. *Jones,* 18 Or. 307, 326 (22 Pac. 1064); *State* v. *Bartmess,* 33 Or. 110 (54 Pac. 167); *State* v. *McDaniel,* 39 Or. 161, 181 (65 Pac. 520); *People* v. *Sherman,* 133 N. Y. 349, 356 (31 N. E. 107); *Arnold* v. *State,* 5 Wyo. 439, 447 (40 Pac. 967); *Territory* v. *Livingston,* 13 N. M. 318 (84 Pac. 1021); *People* v. *Kelly,* 113 N. Y. 647, 651 (21 N. E. 122); *Cady Lumber Co.* v. *Wilson Steam Boiler Co.,* 80 Neb. 607, 610 (114 N. W. 774); *Smith* v. *State,* 46 Tex. Cr. Rep. 267 (81 S. W. 936, 108 Am. St. Rep. 991, 1001). See, also, *Sturgis* v. *State,* 2 Okl. Cr. App. 362 (102 Pac. 57, 71); *Stanley* v. *Stanley,* 112

Ind. 143, 145 (13 N. E. 261); *Thompson* v. *State*, 99 Ala. 173, 175 (13 South. 753); *People* v. *O'Neill*, 107 Mich. 556, 560 (65 N. W. 540); *Battishill* v. *Humphreys*, 64 Mich. 514, 518 (38 N. W. 581); *State* v. *Cummins*, 76 Iowa, 133, 135 (40 N. W. 124); *People* v. *Lukoszus*, 242 Ill. 101 (89 N. E. 749); *Bullard* v. *Pearsall*, 53 N. Y. 230. In view of the apparent reluctance of Luigi Beggi to testify and in view of the answer finally given by the witness and the special circumstances surrounding the examination of the witness, the defendant is not entitled to a reversal of the judgment on account of the questions asked Luigi Beggi.

14. However, since a party cannot use the prior inconsistent statement of his own witness as substantive testimony, the court should always be careful to protect the rights of the opposing party, and, whenever permitting a party to refresh the recollection of his own witness by directing attention to a prior inconsistent statement, the court should inform the jurors of the limited use to be made of the prior statement and should advise them that the prior statement cannot be considered as substantive testimony.

15. The defendant called a number of witnesses who testified that they had never seen the defendant intoxicated or under the influence of liquor. Frank Stroud was one of such witnesses. On his direct examination he stated that he had resided in Beaverton about eight years; that he had been acquainted with the defendant seven or eight years and had seen. her frequently during that time; that he had seen her "a great many times in Beaverton and out of Beaverton a few times"; that he had been "out to her place" a number of times and that he had never seen her intoxicated or under the influence of liquor. On cross-

examination the witness was asked the following question: "In fact she had a reputation down there of getting drunk didn't she?" The defendant objected to the question on the ground that it was not proper cross-examination and was hearsay. The court overruled the objection and thereupon the district attorney repeated the question as follows: "She has got a reputation down there for getting drunk hasn't she?" and the witness answered thus: "I could not answer that question 'yes.' I don't think so." Again the witness was asked on cross-examination, "Isn't it a matter of general neighborhood talk down there that Rosie gets drunk?" The defendant again objected and upon the objection being overruled the witness answered thus: "I can't answer that question. I don't think so." Assuming without deciding that the questions were objectionable nevertheless it is plain that the answers given by the witness in no wise prejudiced the defendant. It is true that subsequently the witness testified that he had heard that the defendant drank and that he had heard "that she gets drunk," but there was no objection made to the questions calling for those answers.

16. David Réghitto was called as a witness for the defendant and, on direct examination, testified that he had "been over to Rosie's home quite often," and, indeed, as often as once or twice a week during the spring and summer time; that Joe "was afraid of nobody"; that he had been at the home of the Merlos at "different times" when "Rosie and her husband were quarreling"; that he had heard Joe call Rosie such names as "cow," "prostitute" and "pig"; that on one occasion the defendant left her husband "and was going to get the sheriff to get her children" and that "Joe came to Beaverton to get Rosie to come

back'' and that Joe came to see the witness; that the
witness told Joe that he did not feel like attempting
to persuade Rosie to return because he had persuaded
her on two previous occasions not to secure a divorce;
that Joe said ''if she come back on the place and every-
thing was all right and they make money and he would
treat her nice and respect her''; and that Joe ''begged
and was nice and sweet as he can be, and talked to my
daughter to come back.'' On cross-examination this
witness stated that Joe ''was a man that was very
jealous.'' When asked on further cross-examination
to tell what the trouble was between Joe and Rosie the
witness explained: ''they don't get along good. All
the time he scolded bad.'' David Reghitto also stated
on cross-examination that Joe and Rosie did not get
along because ''he was a rough man, and a bad man;
and no education; an Italian; a low-class Italian.''
The witness was then asked by the district attorney
the following question:

''Didn't the whole row start over the fact he told
Rosie before he was married that he had a lot of
money?'' ''Didn't he tell Rosie before he was married
that he had a lot of money?'' ''And when Rosie
found out that he didn't have any money after they
were married they had trouble from that time on
didn't they?''

In substance, ''No'' was the answer to each of the
quoted questions. Continuing with the cross-examina-
tion the district attorney afterwards asked the follow-
ing questions and the witness gave the following
answers:

''Q. Didn't you at that time tell Mr. Holsheimer
that you had never seen Rosie and Joe quarrel?

''A. No; I didn't speak to him; I just go around
quick to find Rosie.

92 Or.—45

"Q. And at that time and place didn't you say to Mr. Holsheimer that Joe had come from the old country and he boasted of being a rich man?

"A. No.

"Q. And he didn't have anything and that was the cause of most of the troubles or quarrels?

"Q. Did you tell Mr. Holsheimer that or words to that effect?

"A. I never told Mr. Holsheimer.

"Q. Didn't you tell Holsheimer that at that time?

"A. No, sir. You know yourself that—"

Subsequently, George H. Holsheimer was called as a witness for the state in rebuttal, and he stated that at the time and place mentioned in the questions submitted to David Reghitto the latter stated to the witness "that Joe and Rosie could not get along, but they quarreled all the time, but that he never saw them quarrel"; and "that Joe came from the old country and boasted of being a rich man, but he didn't have anything and that was the cause of most of the quarrels."

The defendant contends that she made no attempt to show, by the witness David Reghitto, the cause of the quarrels, and that therefore it was not proper cross-examination for the state to inquire into the cause of the quarrels. The defendant admitted that she killed her husband; and hence as stated by the defendant in her printed brief:

"The great issue in the case of course, is as to whether or not the killing of the deceased by the defendant was justifiable."

No person now living besides the defendant herself was present at the shooting. No person except Louisa and possibly Louie saw Rosa or Joe, prior to the shooting, at any time after the defendant arrived at the

house that evening. It is true that the defendant says that Louie was at the house, but he denies it; and consequently the prosecution was obliged to rely upon circumstances to support its contention. The state had introduced evidence of threats made by Rosa; both the plaintiff and the defendant introduced witnesses who testified about many quarrels; the defendant had already appeared as a witness in her own behalf and testified about the representation made by Joe concerning his age and that he had told her prior to the marriage that "he had lots of money," but that she found out that he did not have any money. It is admitted that the defendant and her husband quarreled frequently; and consequently the fact that Joe or the fact that Rosa, as the case may be, usually brought about the quarrels would be a very persuasive circumstance in determining whether the killing was criminal as argued by the prosecution, or justifiable as contended by the accused. Before calling David Reghitto, the defendant had told her own story and she as well as other witnesses had given testimony from which it could be argued that the decedent was either alone responsible for the quarrels or at least was an aggressive participant in the quarrels. Indeed, the testimony given by David Reghitto on direct examination, if believed by the jury, furnished a substantial foundation for a finding that Joe and not Rosa was responsible for the quarrels; and while the defendant did not in terms ask the witness to state the cause of the quarrels the questions submitted to him and the answers given by him did in effect say to the jury that the quarrels were caused by Joe illtreating Rosa; and, therefore, the district attorney was well within the limits of Section 860, L. O. L., when he asked the witness whether the quarrels began when Rosa learned that

Joe did not have "lots of money." The matter inquired about on cross-examination was obviously connected with matter stated by the witness in his direct examination and the cross-examination was designed to explain and qualify the direct examination: *Speer* v. *Smith,* 83 Or. 571, 575 (163 Pac. 979).

17. The defendant insists that the cross-examination of David Reghitto concerning his alleged statements to Holsheimer and the testimony of Holsheimer as to those statements was prejudicial error because it was an attempt to impeach a witness by showing contradictory statements concerning matters which were immaterial and irrelevant to the issues in the case. The general rule is that when a cross-examination elicits from a witness matter that is immaterial or wholly irrelevant to the issue the party conducting the cross-examination is concluded as to such matter and cannot impeach the credibility of the witness by showing that he has at other times made contradictory statements touching the same matter: *Josephi* v. *Furnish,* 27 Or. 260, 264 (41 Pac. 424). As already pointed out the cross-examination of David Reghitto was proper because connected with matter stated by him in his direct examination; and it is manifest that the matter inquired about on the cross-examination was material and relevant, to the issue.

Among the witnesses called by the state after the defendant had completed her case in chief was Mike Partipillo, a son-in-law of the decedent, who testified about going to the Good Samaritan Hospital in May, 1915, to visit Annunziatta Merlo, a sister of the defendant, and there, in the presence of Letizia Partipillo and Annunziatta Merlo, hearing the defendant say: "Some day I am going to blow Joe's brains out." Letizia Partipillo, a daughter of the decedent, was a

witness for the prosecution in its case in chief and had testified about the threat referred to by her husband Mike Partipillo. Annunziatta Merlo was also a witness for the state in its case in chief and she had testified that the defendant said that "she would blow somebody's brains out." When the plaintiff called Mike Partipillo and requested him to tell about what occurred in the hospital the defendant objected because the testimony was not proper rebuttal. The district attorney thereupon stated to the court:

"The court has the right, rebuttal or no rebuttal, in the interest of justice, to allow the introduction of testimony that might throw any light on the case. We intended to put this witness on in the direct case but he didn't get out on the train and we rested our case without him";

—and, in the light of that statement, the court ruled that the witness could testify. Strictly speaking, the testimony was not proper rebuttal but was a part of the state's case in chief. It is not claimed that Mike Partipillo had not been subpoenaed. His evidence was cumulative only. The defendant could not have been surprised at the testimony given by Mike Partipillo because both Letizia Partipillo and Annunziatta Merlo had previously testified that he was at the hospital when the alleged threat was made. It is apparent that the plaintiff did not offer the evidence as rebuttal, but upon the contrary, recognizing that it was not proper rebuttal, the district attorney in effect requested the court to reopen the case so that this evidence could be introduced as a part of the state's case in chief. We think that we may fairly assume that the court treated the explanation of the district attorney as a request to reopen the case. Viewing the ruling of the court as a permission to reopen the state's case

in chief, it was in harmony with rather than in violation of the doctrine announced in *State* v. *Minnick,* 54 Or. 86, 95 (102 Pac. 605).

18. Mrs. Martha Hansen testified in rebuttal for the state that she was a passenger on the car which carried the defendant from Beaverton to Santa Rosa, and that in her opinion the defendant was intoxicated when she alighted from the car at Santa Rosa. In its case in chief the state offered no evidence indicating that the defendant was intoxicated on October 4th; nor did the plaintiff offer any evidence that the defendant had on that day drunk any intoxicants except the testimony of J. E. Reeves, the sheriff, who told about the defendant telling him that "she had a couple of drinks of Fernet bitters" in Garbarino's saloon with her husband and the testimony of Palmiro Reghitto, who stated that the defendant, when at her mother's house in Beaverton on the afternoon of October 4th, said: "For once she drank with her husband in Portland," and also that Rosa said "she drank twice with her father." The defendant called six witnesses who had seen her at different times while she was in Portland on October 4th and each of these witnesses stated that the defendant was not under the influence of intoxicating liquor. G. L. Thompson, another witness for the defendant, testified that she was sober when she alighted from the car at Beaverton at 1:42 P. M. and that she was not intoxicated when she departed at 4:07 P. M. Doy Gray, a witness for the defendant, talked with her "a couple of minutes" while waiting at the Beaverton depot for the 4:07 P. M. car and he saw no signs of intoxication. William E. Beydler, another witness for the defendant, saw the defendant within a few minutes after the shooting which had occurred at about 5 o'clock P. M. and he saw no evidence of intoxication.

The testimony of Mrs. Martha Hansen was probably more appropriately a part of the state's case in chief; and yet it must be apparent that the defendant was not prejudiced in the slightest degree by reason of the reception of the evidence in rebuttal instead of in chief.

19. After most of the evidence for both the state and the defendant had been introduced, the district attorney recalled Luigi Beggi in rebuttal and the following questions were asked by the state and the following answers given by the witness:

"Q. Ask him if his uncle—ask him if Davie is his uncle?

"A. No.

"Q. Ask him if he knows anything about the time Rosie got a revolver and was going to kill his uncle?

"A. Yes, sir.

"Q. Ask him to tell the jury about that?

"A. Yes; Davie's brother was cleaning land and Rosie came up and told him—Rosie said if he should not take back the words he said she would shoot him.

"Q. Ask him if she got a gun after him?

"A. I didn't see it.   But he told me that she had it.

"Q. Did he see it?

"A. No, sir.   My father was there.

"Q. Did Rosie tell you that?

"A. No, sir."

There is but little evidence in the record referring to the relationship of Luigi Beggi, but we do read in the transcript, however, that Rosa Merlo in her testimony refers to "Louie Beggi" as "my cousin"; and hence if "Louie Beggi" is the same person as "Luigi Beggi" there is affirmative testimony that Joseph Merlo was not an uncle of Luigi Beggi.   At any rate there is not one word of evidence to indicate that Joseph Merlo was an uncle of the witness; nor is it

claimed by the state that such was in truth the rela-
tionship. The answer of the witness would affirma-
tively indicate that Rosie, the defendant, addressed
her threat to her father's brother. Moreover, this
testimony of Luigi Beggi was doubly incompetent be-
cause he did not "see it" but had only heard about
it. It is plain that this testimony of Luigi Beggi
about what the defendant did and said was not compe-
tent for any purpose; and when we remind ourselves
that any evidence tending to show that one rather than
the other was the probable aggressor on the day of the
homicide would operate as an important factor in the
deliberations and conclusions of the jurors, it can at
once be seen that this incompetent testimony of Luigi
Beggi was highly prejudicial to the substantial rights
of the defendant. The reception of this incompetent
evidence compels a reversal of the judgment. It is
not necessary to determine the extent of the power
conferred upon the Supreme Court by Article VII,
Section 3 of the State Constitution, for the reason that
what was said about the evidence in *State* v. *Rader,* 62
Or. 37, 41 (124 Pac. 195), is equally applicable to the
record presented on this appeal. We do not find it
necessary to discuss any other assignments of error
because some of them are without merit and the ques-
tions involved in others will probably not occur on a
retrial.

The judgment is reversed and the cause is remanded
for a new trial.

BENNETT, J., Concurring in Part.—I concur in the
result announced in the opinion of Mr. Justice HARRIS.
I also concur with his opinion as to the grounds upon
which that result was reached, and agree as to what is
said in regard to the impeachment of the witness,

Luigi Beggi, and as to the general question as to whether or not a party calling a witness, who has simply testified to a negative, may impeach him by showing that he has made at other times affirmative statements, which are inconsistent with his denial of knowledge on the stand, and which, if testified to, would have been material evidence in the cause.

As I understand it, the rule is well settled in this state and generally, that a party calling a witness, who simply says, in relation to a given matter, that "I don't know" or that "I don't remember" cannot impeach his own witness by showing that he has made statements at other times, that he did know, and has related facts favorable to the cause of the party calling him.

In *Langford* v. *Jones,* 18 Or. 307, 326 (22 Pac. 1064), Chief Justice THAYER, delivering the opinion of the court, said:

"Section 838, Civil Code, permits the party introducing a witness to contradict him by other evidence, and to show that he has made at other times statements inconsistent with his present testimony; but that section does not allow the party to inquire about matters regarding which the witness *has not given any testimony, or testimony of a weak and unsatisfactory character,* and then prove his statements made at another time in reference to such matters. The intent of the provision was to allow a party producing a witness who *testifies adversely to him* regarding some matter which directly affects the merits of the case, to impeach such testimony in the manner there pointed out. The object of the section was to prevent the party from being prejudiced by the evidence of his own witness. He may, of course, call his attention to any statements he may have made at other times, for the purpose of refreshing his memory, but he has no right to ask him about his having made some statement at another time, favorable to the party's side of

the case, which the witness has given no testimony in
regard to; nor, *a fortiori,* to prove what that state-
ment was. The Code certainly did not intend to per-
mit a party to get in testimony as a makeweight, in
support of his cause of action or defense, by such a
course; and that evidently is the character of the said
statement. To allow a party, after calling him as a wit-
ness and failing to elicit from him any advantageous
testimony, to prove that the witness at some other
time and place had made statements favorable to the
claim of the party, is a strange mode of securing proof.
It would be a kind of evidence which I could not dis-
tinguish from hearsay. Counsel for appellant cited a
number of authorities to show that such a course was
not permissible; but I think that the bare statement
of the proposition is a sufficient refutation of its cor-
rectness. If it were proper, a case could be made out
many times by proof of what third persons had said;
it would only be necessary to call the persons as wit-
nesses and attempt to show by them the substance of
the matter embraced in the statements, and having
failed in that, then to prove what such persons had
said at another time and place, when they were not
under oath, and obtain the benefit of that as direct evi-
dence of the fact. Such a construction would enable
parties to employ as a sword what was intended as a
shield. Instead of availing themselves of the benefits
of the statutory rule in order to avoid the effect of
damaging testimony given against them by a witness
called to prove a fact in their favor, they could make
use of it for the direct purpose of establishing the fact.
It is enough to say that the legislature never intended
by said provision of the Code to adopt any such
absurdity.''

This opinion was quoted with approval by Mr. Jus-
tice MOORE in *State* v. *Steeves,* 29 Or. 85 (43 Pac. 947),
in a very carefully prepared opinion, in which that
learned and careful Jurist adds:

"The rule appears to be well settled that a party cannot impeach his own witness by showing he had made statements inconsistent with the testimony given at the trial, unless the testimony *so given* be material and prejudicial to the interests of the party calling him."

And in *State* v. *Yee Gueng,* 57 Or. 509 (112 Pac. 424), Mr. Justice KING, delivering the opinion of the court, quotes both of the preceding cases with entire approval, and says:

"Applying the rule thus announced to the case in hand, it will be observed that the witness gave no testimony directly adverse, or prejudicial to the state. He was asked whether certain conditions existed, and the tenor of his responses was to the effect that he did not know, or could not furnish the desired information, * * it was merely testimony of a 'weak and uncertain character' such as adverted to in *Langford* v. *Jones,* and suggested in *State* v. *Steeves* * * Nor can the fact that the former statements were made under oath change the rule, for the accused in this case, although jointly indicted with Lem Woon, was not on his trial at that time, was not present when the statements were made, and had he been present would have had no opportunity to cross-examine the witness or to dispute his assertions."

This is also the rule, as I read the reports, laid down generally, and almost universally, in the decisions of the courts of other states

In *Commonwealth* v. *Welsh,* 70 Mass. (4 Gray) 535, it appears from the statement of the case, that—

"The witness testified with a great deal of reluctance, and showed a strong disposition to conceal the facts which he knew, and evaded the questions put to him by the District Attorney."

He was asked the following question:

"Q. Did you not swear before the grand jury that you did know the defendant's business, and that you did know where the defendant's shop was situated * * ?

"The district attorney assigned no reason for putting the question, and the court gave no reason for allowing it, nor was their any explanation made by court or counsel."

The court, by SHAW, Chief Justice, says:

"The evidence of what the witness testified before the grand jury ought not to have been received. It bore upon no question pertinent to the issue. It was not to neutralize the effect of evidence given by the witness against the party calling him; for the witness had given none. It could only be to disparage the witness, and show him unworthy of credit with the jury, which was inadmissible."

The Supreme Court of Kentucky in *Saylor* v. *Commonwealth* (Ky.), (33 S. W. 185, 186), says:

"Nor can a witness who fails to testify to substantive facts *be asked if he has not made statements* to others out of court, that such facts exist, for the purpose of proving that he had made such statements, as that would transform declarations made out of court, and not under the sanction of an oath, into substantive testimony.

In *Rickerson* v. *State,* 106 Ga. 391, 392 (33 S. E. 639), the prosecution was for seduction. The defendant called a witness who, upon his examination, testified that he had never had intercourse with the female in question. Counsel for the accused then offered to impeach his statement, and the court said:

"While under our statute (Civil Code, 5290) a party may impeach a witness voluntarily called by him, where he can show to the court that he has been entrapped by the witness by a previous contradictory statement, yet this rule is not applicable where the tes-

timony of the witness is not prejudicial to such party. In such case the credibility of the witness is immaterial, as he has done no damage. The mere failure of a witness to testify to facts supposed to be beneficial to the party introducing him and which were expected to be proved by him does not come within the reason or policy of the rule.''

In *Nathan* v. *State,* 131 Ga. 48 (61 S. E. 994), the court approved the Rickerson. case and followed the same.

To the same effect is *State* v. *Reed,* 60 Me. 550; *People* v. *Creeks,* 141 Cal. 529 (75 Pac. 101) ; *In re Dolbeer's Estate,* 153 Cal. 652 (96 Pac. 266, 15 Ann. Cas. 207) ; *Commonwealth* v. *Bavarian Bluing Co.,* 26 Ky. Law Rep. 121 (80 S. W. 772).

In 40 Cyc. 2696, the rule is stated thus:

''The mere fact that a witness has failed to testify as expected does not warrant impeaching him by proof of prior statements in conformity to what he was expected to testify; but proof of prior contradictory statements of a party's own witness is admissible only where the witness has given affirmative testimony hostile or prejudicial to the party by whom he was called; and in such case the proof must be confined to contradictions of the testimony of the witness which is injurious to the party seeking to impeach him.''

Indeed, the only exceptions to the universality of this rule seem to be a few cases where the court has failed to distinguish between the materiality of the testimony actually given by the witness in the same trial in which he is sought to be impeached, and the materiality of the proposed statements made by the witness, out of court, or in some other proceedings, where the adverse party had no opportunity to cross-examine.

The only discordant note among the cases in our own state that I have been able to find is the opinion of Mr. Chief Justice BEAN in *State* v. *McDaniel*, 39 Or. 161 (65 Pac. 520). We all have great respect for the opinions of this learned and careful Jurist, but his opinion in the McDaniel case seems to have been based upon the theory that, as the facts which the witness had stated out of court, would have been material if they had been followed by his statements at the trial, the denial of knowledge in relation to such facts by the witness, would be "adverse testimony" and would entitle the party calling the witness to impeach him by contradictory statements in relation thereto, even if the actual testimony of the witness in court was purely negative. For myself, I cannot see how the opinion in the McDaniel case can possibly be reconciled with the rule in the Langford case, the Steeves case, and the case of Yee Gueng, or with the rule so universally adopted in other states.

It is well settled in this state that the party calling a witness vouches for his truthfulness and credibility: *Chance* v. *Graham*, 76 Or. 199 (148 Pac. 63); *Sabin* v. *Kyniston*, 81 Or. 358 (159 Pac. 69).

In this case the facts sought to be proved by the state from the lips of Beggi were that, in the quarrel between the defendant and the deceased, part of which he had witnessed, the defendant had "started the quarrel." As to this the witness, who was called by the state, testified that "He did not know" as to that. He then testified as follows:

"Q. Do I understand you to say that you do not know who started the quarrel when they started to quarrel?

"A. No. * *

"Q. You remember being in the grand jury room, don't you?

"A. Yes, sir.

"Q. When this case was being investigated, you remember that time?

"A. Yes, sir.

"Q. And the grand jury and myself being present, didn't you, at that time and place in the first part of November, I think it was, make the following statement: 'All the time they had trouble, yes, sir; I know it, all the time they had trouble, Rosa all the time started it, she started it first, some time Joe run away outside, some time she drink too much.' "

To this there was an objection that it was an attempt to impeach the state's own witness, which objection was overruled by the court and the district attorney was permitted to proceed as follows:

"Q. Didn't you say that at that time and place?

"A. I think so.

"Q. You think you said that?

"A. Yes, sir.

"Q. Was it true

"A. I guess so.

"Q. Was it or not true?

"A. Well, that is true."

I cannot agree that the effect of this testimony was not to impeach the witness, simply because other witnesses were not called for that purpose. Anything which tends to discredit a witness, either on account of his bias, inaccurate memory or untruthfulness, tends to impeach his testimony to that extent. It impeached Beggi, it seems to me, just as fully, to show by *his own evidence,* that he had made previous inconsistent statements, as it would to have called other witnesses to show the same contradictory statements. It would be the fact that he had made these contradictory statements, and not the manner of proving them, which would impeach the credibility of his testimony.

As to the admissibility of this testimony for the purpose of refreshing the memory of the witness, I agree that under the rule established in this state, the preliminary questions as to his testimony before the grand jury, with *proper safeguards* to prevent it being considered by the jury as substantive evidence, and *after the proper foundation had been laid, might* have been admissible, for that purpose.

But here there were no safeguards, and from the record I do not think the contradictory statements were offered or received "to refresh the memory." There was no statement of any such special or preliminary purpose, either by the district attorney or the court. The form of the question was suggestive of impeachment and was the form usually employed for laying the foundation for impeachment by other witnesses. There was *absolutely no foundation for refreshing the memory* of the witness. No suggestion that the witness had forgotten, and no attempt to show that his memory of the transaction *was fresh at the time of his testimony* before the grand jury, which must have been over a month, and probably many months—possibly even years—after these quarrels he had been testifying about. He said he had worked for the Merlos several years—"a few days each year"— and it was during these years that these quarrels occurred.

The only express provision in our statutes for refreshing the memory of a witness at all is in the case of written memoranda, and in such case it is carefully provided that it must be made, "at the time when the fact occurred or immediately thereafter, or at any other time, *when the fact was fresh in his memory*": Section 859, L. O. L.

This rule, I think, is not an arbitrary one, but is taken from the common law, and is based upon centuries of judicial experience and observation. The reason of it is just as applicable to oral statements. Indeed, the reasons for a strict rule are far greater, in the case of oral statements, and the danger to the adverse party far more imminent, for in the case of written memoranda, it does not go before the jury at all (except at the option of the party against whom it is used) and, therefore, there is no risk of the jury giving it substantive consideration, which is always so great a danger to the rights of the adverse party, in the case of oral statements. Such rule ought to be especially applicable, where the alleged statements were made before a secret tribunal like a grand jury, where the proceedings are only known to the district attorney, and the members of the grand jury who are sworn not to disclose the same; and where the defendant had no right to be present, and cannot know by what irregular means or leading or coercive questions the statements were secured.

This question was squarely before the Supreme Court of the United States in *Putnam* v. *United States,* 162 U. S. 687 (40 L. Ed. 1118, 16 Sup. Ct. Rep. 923), which was a case on all-fours with this case. There, a witness called by the government, had been asked:

"Q. Did he ever, at any time, tell you what he had done with these bonds?

"A. Not that I now recollect."

Thereupon the attorney for the government stated:

"I propose to ask this witness a leading question, because I am taken by surprise at his answer after his testimony before the grand jury, and I wish to ask him if he did not testify to certain things before the grand jury."

92 Or.—46

This was allowed over the exception of the defendant, whereupon the witness was asked:

"Q. * * Do you not recollect that you testified before the grand jury that when you discovered those bonds were gone, you went to Boston and learned that Mr. Putnam had them, and that he acknowledged to you that he had those bonds on the 3d of August? Did you not so testify before the grand jury?

"A. If it is a matter of record I suppose it is so. * *

"Q. I am asking if you did not so testify before the grand jury?

"A. If it is a matter of record, I do not dispute the record. * *

"Q. Let me refresh your recollection a little further. Did you testify before the grand jury that you said to him something about the bond, and he said, 'Mr. Dorr, I will state to you, I am not going away?'

"A. Yes, sir, I did. * *

"Q. And did he not say, 'I will get the bonds for you as soon as I can'?

"A. Yes, I can assent to that."

The court held this was error, treating the evidence as covered by exactly the same rule, as if it had been a written memorandum, the court in an opinion by Mr. Justice WHITE, now Chief Justice, saying:

"The very essence, however, of the right to thus refresh the memory of the witness, is that the matter used for that purpose be contemporaneous with the occurrences as to which the witness is called upon to testify. Indeed, the rule which allows a witness to refresh his memory by writings or memoranda, is founded solely on the reason that the law presupposes that the matters used for the purpose were reduced to writing so shortly after the occurrence, when the facts were fresh in the mind of the witness that he can, with safety, be allowed to recur to them in order to remove any weakening of the memory. * * It is well settled that memorandum are inadmissible to refresh the

memory of a witness unless reduced to writing at or shortly after the time of the transaction and while it must have been fresh in his memory.''

See, also, *Commonwealth* v. *Bavarian Bluing Co.*, 26 Ky. Law Rep. 121 (80 S. W. 772); *Commonwealth* v. *Welsh,* 70 Mass. (4 Gray) 535; *Commonwealth* v. *Blood,* 77 Mass. (11 Gray) 74.

It seems to me that this is the true rule, and is in entire harmony with the rule established by our statute, and by the common law, where the attempted refreshment of memory is by a writing.

Here, as we have seen, there was no such foundation—no suggestion of a purpose to refresh the memory. The form of the question was suggestive of impeachment. I cannot resist the conclusion, that the evidence was offered and received, as substantive evidence, for the purpose of impeaching the witness, and incidentally getting before the jury in the trial court the evidence given by the witness before the grand jury, when the defendant was not present. This conclusion seems to me to be further strengthened by the manner in which the district attorney used the evidence after he had compelled the witness to admit that he had made the statements. He did not follow it up by asking, ''What do you say now?'' or ''What is your memory now, after being refreshed, as to who did start the quarrel?'' On the contrary, his form of questions was still directed toward impeachment.

''Q. Didn't you say [that] at that time and place?
''A. I think so.
''Q. Was it true?
''A. I guess so.
''Q. Was it or not true?
''A. Well, that is true.''

It does not seem to me that an attorney for either party to a litigation has a right to put a witness on the stand and vouch for his credibility, and then, when the witness does not testify as strongly as he expects, to assume that he is lying, and proceed to get him in a corner and by impeachment and threats of impeachment, drive and coerce him to testify to things, as to which he now says in court that he has no knowledge; and then defend it on the theory that he had a right to refresh the memory.

The rules of evidence are for the elucidation of truth, but they are also framed to protect the parties and *to prevent the poisoning of the mind of the jury by hearsay testimony and declarations out of court.* An honest witness (and the district attorney in this case vouched for the honesty of this witness) who is trying to tell the exact truth, may, when confronted with some hasty or inaccurate statement he has previously made, find himself very much embarrassed; and if he is threatened with the disgrace of impeachment, and happens to be ignorant or timid, and unable to explain himself, may, if he is cornered close enough by repeated questions, be willing, in sheer desperation, to answer "yes" to any question, if he thinks that answer will relieve him from the distressing situation.

In *State* v. *Steeves,* 29 Or. 85 (43 Pac. 947), it is said by Mr. Justice MOORE, in relation to the introduction of such evidence, that:

"Courts should carefully guard against its abuse, by the party producing the witness."

I think, where a party desires to ask his own witness about contradictory statements, for the purpose of refreshing his memory, he should lay the proper

foundation and *state that the evidence is offered for this special purpose;* and if he does not, the presumption is that he offers it as substantive evidence, to go to the jury for the purpose of impeachment, and the adverse party has a right to so assume, and frame his objection upon that ground.

I also think, where the evidence is offered for such purpose, that the examination should stop, as to such statements, when the attention of the witness has been called thereto; and that the party calling him should not be allowed to make such hearsay statements substantive, by attempting to prove that they were true. Having refreshed the memory of the witness, he should then revert back to the original examination, and ask the witness to state the facts as he now remembers them.

In *Trammell* v. *McDade,* 29 Tex. 361, the court says:

"It is difficult to conceive of a more objectionable form of putting a question to a witness, than is present in this case. His previous deposition is set out, * * and the substance of the last interrogatory is to know *if the first answers were true* according to the recollection of the witness, at the time of giving the first answers, and the witness answers that the answers first given were true, according to his recollection at that time. The deposition was properly excluded. The witness does not propose to give his recollection at the time of testifying, except by reference to the first deposition, and his belief that his first answers were true when made."

In short, it seems clear to me that the contradictory statements in this case were offered, received and considered by the jury, for the purpose of impeachment and as substantive evidence, which was improper and prejudicial; and that the claim now, that they were

admissible to "refresh the memory," is a mere after-thought and cover for the real purpose.

In such a case the language of Judge Thayer in the Langford case is particularly applicable:

"The Code certainly did not intend to permit a party to get in testimony, as a make weight in support of his cause of action or defense, by such a course."